OHIO PUBLIC INTEREST CAMPAIGN,
et al., Plaintiffs,

v.

FISHER FOODS, INC., et al.,
Defendants.

David A. PARRISH, Plaintiff,

v.

FAZIO'S, a.k.a. Fisher Foods, Inc., et
al., Defendants.

Michael ROSEN, et al., Plaintiffs,

v.

FISHER FOODS, INC., et al.,
Defendants.

Nos. C 80–495, C 79–2156 and C 80–794.

United States District Court,
N. D. Ohio, E. D.

April 27, 1982.

Jack Schulman, Howard Schulman, Cleveland, Ohio, for plaintiff Ohio Public Interest Campaign, et al.

Donald Traci, John Lancione, Spangenberg, Shibley, Traci & Lancione, Cleveland, Ohio, for plaintiff David A. Parrish.

Robert Gary, Lorain, Ohio, Katherine H. Walsh, Oberlin, Ohio, for plaintiff Michael Rosen, et al.

John Leech, Michael Miller, Calfee, Halter & Griswold, Cleveland, Ohio, for defendant First National Supermarkets.

John McClatchey, Leslie W. Jacobs, Mark Kennedy, Thompson, Hine & Flory, Cleveland, Ohio, for defendant Fisher Foods, Inc.

S. Lee Kohrman, Ronald Weiss, John Ballard, Kohrman, Jackson & Weiss, Cleveland, Ohio, for defendant Ass'n of Stop-N-Shop Supermarkets.

## MEMORANDUM OPINION INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAMBROS, District Judge.

Before this Court for final approval is a settlement in three related consumer class actions which charge major food retailers in Northeast Ohio with price fixing in violation of 15 U.S.C. § 15.

*David A. Parrish v. Fazio's, a.k.a. Fisher Foods, Inc., et al.,* No. C 79–2156, was filed on November 16, 1979 against Fisher Foods, Inc. (Fisher), the Association of Stop-N-Shop Supermarkets (Stop-N-Shop), First National Supermarkets, Inc. (Pick-N-Pay), Bi-Rite Supermarkets and Heinen's, Inc. The complaint alleged that the defendants had, for an "indeterminate period", fixed the prices charged "for food within their respective territorial and geographical markets" in violation of the Sherman Act. Mr. Parrish alleged that he was a proper representative of a class composed of "all ... consumers ... within the territorial and geographical markets of the defendant food retailers." In an amended complaint filed on November 10, 1980 Parrish added as additional defendants the Kroger Company, the individual Stop-N-Shop corporate members, the Lawson Milk Company, Hawthorn Mellody, Inc. and A & W Foods. All defendants filed answers to the first and second amended complaints, denying all liability and asserting certain affirmative defenses. Parrish propounded interrogatories to the defendants, some of which were answered by the defendants. The action was originally assigned to the Honorable William K. Thomas, but has since been formally consolidated with below-mentioned actions pending before this Court.

*Ohio Public Interest Campaign et al. v. Fisher Foods, Inc., et al.,* No. C 80–495, (OPIC) was filed on April 3, 1980, naming as defendants Fisher, Pick-N-Pay, the Kroger Company, Heinen's, Inc., individual corporate members of Stop-N-Shop, the Lawson Milk Company, Hawthorn Mellody, Inc., A & W Foods and Bi-Rite Supermarkets. That complaint charged the defendants had conspired to fix prices "on the sale of food

products in Cuyahoga, Lake and Summit Counties, Ohio." Plaintiffs alleged that they represented two classes. The first was all "persons in Cuyahoga, Lake and Summit Counties, Ohio" who "have had check-cashing privileges at any of the defendants' retail outlets from January 1, 1972 [to April 3, 1980], and who used the check-cashing privileges in purchasing food products from any of the defendants and all persons who paid for their purchases at any of the defendants' retail outlets with authorized bank cards." The second alleged class was "all consumers in Summit, Lake and Cuyahoga Counties who purchased food products from any of the defendants from January, 1972, to April 3, 1980." They sought damages in an amount of $100 million on behalf of the first class and an injunction on behalf of the second class prohibiting the defendants from conspiring to fix prices, monopolizing or attempting to monopolize in violation of the Sherman and Clayton Acts.

In total, more than 200 pleadings have been docketed in *OPIC*. All defendants filed answers denying the allegations of the complaint. Plaintiffs filed three sets of interrogatories and requests for production of documents directed toward each defendant, and certain defendants submitted interrogatories and requests for the production of documents to plaintiffs. Defendants filed a Joint Motion to Stay Discovery and plaintiffs filed a Motion to Compel Discovery. Plaintiffs filed a Motion for Certification as Class Representatives, to which all defendants submitted a Joint Response in Opposition. Defendants filed a Motion to Dismiss *OPIC* on the ground that it was not a proper representative of the classes alleged in the complaint, and plaintiffs submitted a brief in opposition thereto.

*Michael Rosen v. Fisher Foods, et al.* was filed on May 14, 1980 against Fisher and Pick-N-Pay, alleging that those enterprises conspired to "fix prices on the sale of food products" in Lorain County, Ohio. The plaintiffs alleged that they represented two classes, the first of which was composed of all persons "in Lorain County who have had check-cashing privileges at any of the defendants' retail outlets and who utilized this check-cashing privilege in purchasing food products from any of the defendants." The second class purportedly consisted of all "consumers in Lorain County who purchased food products from any of the defendants at retail from January 1, 1972, to the date of the filing of the action." On behalf of the first class plaintiffs sought damages of $30 million, and on behalf of the second class plaintiffs demanded injunctive relief prohibiting the defendants from conspiring to fix prices, monopolizing, attempting to monopolize and from any further violations of the Sherman and Clayton Acts. In February 1981 the *Rosen* complaint was amended to add as a new party Hawthorn Mellody, Inc. All defendants denied all allegations of the plaintiffs' complaint. Plaintiffs filed one set of interrogatories, which were answered in part by the defendants. Plaintiffs also filed requests for production of documents to which the defendants never responded. The defendants submitted interrogatories, which were answered by the plaintiffs.

The initial pretrial conference in *OPIC* was held on November 3, 1980. At that time counsel for Fisher, Pick-N-Pay and the Association of Stop-N-Shops (hereinafter referred to as the settling defendants) advised the Court that they would like to explore the possibility of a settlement. More particularly, they proposed jointly to retain an economic expert to examine information available from these defendants and from other retail industry and public sources in an effort to determine objectively the range of arguable impact that may have resulted from any alleged violations of law that may have occurred. Settling defendants requested a 90 day-moratorium on discovery to accomplish this task. With the consent of the *OPIC* counsel, the Court authorized counsel for the settling defendants to proceed as proposed, and imposed the discovery moratorium. Economist Dr. Lee Preston of the University of Maryland was jointly retained by counsel for the settling defendants for the purpose of making such an assessment.

However, January 16, 1981 the Stop-N-Shop defendants executed a $100,000 settlement agreement with the named plaintiffs in the *OPIC* action. The settlement agreement required the Stop-N-Shop defendants to make full disclosure to the *OPIC* plaintiffs of information in their possession and to cooperate fully with the OPIC plaintiffs in the prosecution of the *OPIC* action. OPIC also retained economist Dr. James Zinser to evaluate this and other available data.

Another *OPIC* pretrial conference was held on February 13, 1981. Invited to attend this conference were counsel for *Parrish* and *Rosen* as well as counsel for *Meyer Goldberg Inc. v. Fisher Foods, Inc.,* No. 79–558. The *Meyer Goldberg* case involved a competitor's suit, and while the theory of liability and recovery was quite different than that presented in the class actions, it appeared to this Court that the same discovery issues were presented in all four cases. At that time the Court strongly encouraged counsel for all four cases to work together and coordinate their efforts in order to eliminate needless duplication. By letter dated February 17, 1981, counsel for the plaintiffs in the *OPIC, Parrish, Rosen* and *Meyer Goldberg* actions informed the Court and defense counsel that they had agreed to coordinate their efforts, that any future settlement negotiations with defendants would be conducted by all plaintiffs' counsel as a group, and that no separate settlement discussions would occur. On February 26, 1981 the other class action plaintiffs joined the *OPIC* settlement agreement with Stop-N-Shop.

Defendants Bi-Rite, Heinen's, Kroger's, Lawson Milk Company and A & W Foods indicated no interest in exploring settlement possibilities, did not participate in the settlement negotiations, and plaintiffs have moved for their dismissal as parties to this action. Plaintiffs did reach a settlement agreement with Fuqua Industries and H.M. Liquidating Inc., the successors in interest to Hawthorn Mellody, Inc. This settlement is the subject of a separate order, and Fuqua/H.M. Liquidating are not considered settling defendants for the purposes of this memorandum opinion.

Dr. Preston made an oral presentation of his analysis to all class action plaintiffs' attorneys on March 20, 1981. At the conclusion of the presentation, Fisher and Pick-N-Pay made an offer to settle the litigation for $1.5 million. On April 1, 1981, counsel for the class plaintiffs, based upon their own analysis, made a counter-demand of $40 million. The parties passionately disputed the data and methodologies of their respective experts, both of whom with counsel made extensive oral and written presentations to the Court which were exchanged by counsel for the parties.

Faced with this inability of either side to agree on underlying factual assumptions, let alone on an applicable theory of evaluation, this Court found it necessary to appoint its own advisor in order to interpret the data fairly. To this end the Court named Mr. Harold Kelley, a certified public accountant and attorney of Ashland, Kentucky with broad familiarity with the retail food industry, as its economic advisor pursuant to Rule 706, Federal Rules of Evidence. *See also* Manual for Complex Litigation § 3.40. Mr. Kelley thereafter played a key role in the lengthy, protracted and heated negotiations.

The Court is personally aware that the negotiation process was intense, often to the point of unrestrained acrimony. Every issue was contested in an extreme adversarial context. The resolution occurred on November 12, 1981, when an agreement of settlement was achieved and executed. Preparation of the details and schedules for implementation of the November 12, 1981 settlement took until February 19, 1982, on which date the parties submitted the stipulation of settlement and attached schedules.

In summary the general terms of the November 12, 1981 settlement as implemented in the February 19 stipulation are as follows:

Two settlement classes will receive benefits from the settlement. One class, known as the (b)(2) settlement class, consists of every person or business entity that pur-

chased grocery products at retail from any store located in Cuyahoga, Lorain, Lake, Geauga, Portage, Summit and Medina counties, Ohio, from January 1, 1972 to November 12, 1981. In return for a dismissal of all the (b)(2) settlement class members' claims against them, the settling defendants have agreed to an injunction which restrains each of them and their officers and directors from engaging in any arrangement to fix or stabilize the retail price of any grocery product in the seven counties of Northeast Ohio.

A (b)(3) Settlement Class is also created which consists of those individuals who were occupants of a residence in the seven-county Northeast Ohio area and by whom or for whose consumption grocery products were purchased from any store in the area from January 1, 1972 to November 12, 1981. In return for a dismissal of all claims of the (b)(3) settlement class members against them, the settling defendants will issue to the (b)(3) settlement class Food Purchase Certificates (Certificates) having a total face value of $20,000,000.00. The Certificates will be sent to all households that did not opt out of the (b)(3) settlement class, will be in denominations of $1.00 each (subject to a slight adjustment) and will be useable at a rate of two Certificates in each of ten consecutive six-month periods following their distribution. These Certificates may be used by the recipients to purchase food products from the settling defendants or from any other qualified grocery vendor that applies to the Court and agrees to redeem and honor the Certificates submitted by consumers in accordance with their terms.

Recognizing the likelihood that many Food Certificates will not be utilized by their recipients, the settlement further provides for a charitable food payment program. Under the provisions of this plan to the extent that Certificates are not redeemed in any given year, the settling defendants will make contributions of food or cash, as detailed in Schedule B, to charitable organizations that give away food to the needy. A special master, aided by an advisory board, will oversee the administration of this program, which will last seven years. The settlement further provides that in no year shall these food payments total less than $300,000.

The settlement further provides that the settling defendants will pay, from a $2,650,-000 fund established by the settling defendants with the Clerk of Court, plaintiffs' attorneys' fees and expenses in an amount to be determined by the Court according to established rules of law. Under the terms of the settlement agreement, plaintiffs' counsel are required to submit applications to the Court for payment of their fees and expenses upon the conclusion of the litigation. The Court will then determine and award fees and expenses based upon established rules of law. All parties have agreed to accept the Court's decision without further dispute or litigation. This procedure is similar to arrangements established in other class actions where defendants have agreed to pay plaintiffs' attorneys' fees in addition to, rather than as a deduction from, the settlement fund. *See also In re Montgomery County Real Estate Antitrust Litigation,* 83 F.R.D. 305 (D.Md.1979); *Arenson v. Board of Trade of Chicago,* 372 F.Supp. 1349 (N.D.Ill.1974); *Colson v. Hilton Hotels Corp.,* 59 F.R.D. 324 (N.D.Ill.1972). Settling defendants will also pay all costs of creating the settlement and administering it through the seven years of the program.

In return for the obligations of the settling defendants, the claims of the members of the (b)(2) and (b)(3) settlement classes will be dismissed with prejudice. The settling defendants' obligations shall not be joint and several. The Court shall retain jurisdiction over the settlement throughout the seven years of the settlement program.

On February 19, 1982 the Court gave conditional approval to this agreement and certified tentative classes for settlement purposes. The Court ordered that notice be provided to members, and during the week of March 12, 1982, 1,122,422 notices were sent by United States mail, in the form set forth in Schedule E to the Stipulation of Settlement, to all households and all busi-

nesses with postal addresses in the seven-county area. In addition, the Notice was printed on March 19, 1982 and March 23, 1982 in nine different newspapers of general circulation in the seven-county area, and an enlarged copy was prominently posted in each store of the settling defendants from March 12 to April 2, 1982 with 750 copies available for customer requests at each store.

The Notice permitted any member of either class to opt out of the settlement by submitting a form to the Clerk of this Court and further provided for formal objections to the terms of the Stipulation of Settlement by timely filing such an objection and serving the listed counsel. By the April 2, 1982 deadline contained in the Notice, the Clerk of Court received 3,060 requests for exclusion (approximately 0.27% of the total class members).

One objection was timely filed but did not conform with the provision of the Court's Order that any such objection be served on counsel for plaintiffs and defendants. Guy T. Black asked that owners of animals be given a larger portion of the settlement than non-animal owners, and that the settlement be modified to include pet food. Although the objection was procedurally deficient, Mr. Black was allowed to make an oral presentation at the April 14 fairness hearing. The Court reminded Mr. Black that the Food Certificates could be redeemed for pet food, and informed him that granting his objection and attempting to distribute the Food Certificates based on the number of members in a household—whether human or animal—would ultimately render the settlement unmanageable. This Court finds that Mr. Black's objection is not well taken, and hereby overrules it.

 Rule 23(e), Fed. R. Civ. P. provides that "[a] class action shall not be dismissed without approval of the court." Although the "law generally favors and encourages the settlement of class actions," *Franks v. Kroger Co.,* 649 F.2d 1216, 1224 (6th Cir. 1981), the Court's approval depends on its finding that the proposed settlement is "fair, reasonable, and adequate." *Grunin v.*

*International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), *cited with approval in Laskey v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW),* 638 F.2d 954, 957 (6th Cir. 1981). The Court must also ascertain that "there was no fraud or collusion in arriving at the settlement." *Miller v. Republic National Life Insurance Co.,* 559 F.2d 426, 428–29 (5th Cir. 1977). Approval of a class settlement is discretionary with the Court, and the Court's acceptance of the settlement will only be disturbed upon a showing of an abuse of that discretion. *Laskey,* 638 F.2d at 957. While proponents of the settlement bear the burden of proving that the proposal should be approved, *Grunin,* 513 F.2d at 123, they "should not be required to stage a mini-trial on the merits, the event which settlement aims to preclude." *In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357, 1367 (N.D. Ga. 1979), *aff'd in part, rev'd in part on other grounds,* 645 F.2d 488 (5th Cir. 1981).

Criteria for determining the fairness, reasonableness and adequacy of a class action settlement have been set forth by the Fifth Circuit Court of Appeals in *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 207 (5th Cir. 1981):

> First, the district court must evaluate the likelihood that plaintiffs would prevail at trial. Second, the district court must establish a range of possible recovery that plaintiffs would realize if they prevailed at trial. And third, guided by its findings on plaintiffs' likelihood of prevailing on the merits and such other factors as may be relevant, the district court must establish, in effect, the point on, or if appropriate below, the range of possible recovery at which a settlement is fair and adequate.

643 F.2d at 212. In the third step of this analysis, "the court is not confined to the mechanistic process of comparing the settlement to the estimated recovery times a multiplier derived from the likelihood of prevailing on the merits. The court should

be guided by other factors, the relevancy of which will vary from case to case." 643 F.2d at 217.

The Fifth Circuit further suggested that other factors to be considered by a Court should include the complexity, expense and likely duration of the litigation; the reaction of the class to the settlement; and the stage of the proceedings. Based upon a thorough analysis of these factors, the Court "should proceed to explain why it is either approving or disapproving the settlement." *Id.*

Prior to *Corrugated Container,* the Second Circuit Court of Appeals, in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974), had articulated nine factors relevant to the determination of the fairness of a class action settlement:

> "(1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendant to withstand a greater judgment ...; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation ...."

495 F.2d at 463.

It is clear that save for organizational differences, the standards articulated in both *Grinnell* and *Corrugated Container* mandate consideration of basically the same factors testing the reasonableness, adequacy and fairness of a class action settlement. Therefore, the use of either analysis in evaluating a proposed class action settlement necessarily incorporates the considerations required by the other analysis.

Having extensively considered the terms of the November 12, 1981 settlement and of the stipulation of settlement, this Court finds that they are fair, reasonable and adequate. This settlement offers the best practical means for a fair resolution of this litigation. In fact, the benefits that the purchasers of grocery products from 1972 to 1981 will derive from this settlement are substantially greater than they objectively could ever hope to obtain from continued litigation.

### The Likelihood that Plaintiffs Would Prevail at Trial.

Section 4 of the Clayton Act, 15 U.S.C. § 15 (1970), creates a cause of action only for a person who is "injured in his business or property by reason of anything forbidden in the antitrust laws." In order to recover under the antitrust laws, every plaintiff must prove: (1) a violation of an antitrust law, (2) a direct injury from such violation, and (3) the amount of damages sustained as a result of such violation. *See, Alabama v. Blue Bird Body Co.,* 573 F.2d 309 (5th Cir. 1978); *Windham v. American Brands, Inc.,* 565 F.2d 59 (4th Cir. 1977). Thus, recovery under § 4 of the Clayton Act is based not on the conspiracy itself but upon the actual injury suffered by the individual plaintiff. *Shumate v. National Association of Securities Dealers, Inc.,* 509 F.2d 147 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975). Fact of injury must be proved with certainty, *Id.,* at 152, and the plaintiff must prove that his injury directly resulted from the antitrust violation. *Alabama v. Blue Bird Body Co.,* 573 F.2d at 317. The fact that an alleged antitrust violation may be a *per se* offense under the criminal provisions of section 1 of the Sherman Act does not satisfy all the elements necessary for recovery under § 4 of the Clayton Act. *See, e.g., McMackin v. Schwinn Bicycle Co.,* 354 F.Supp. 1154 (N.D. Ill. 1973). Thus each plaintiff seeking to recover damages due to an alleged price-fixing conspiracy must show with certainty that he made purchases of a price-fixed product at a price raised by reason of the illegal agreement above the competitive level that otherwise would have prevailed. *See, e.g., In re Hotel Telephone Charges,* 500 F.2d 86 (9th Cir. 1974).

If the lawsuits at issue here were to proceed to trial, there is some doubt that plaintiffs would be able to convince a jury that there was direct injury from an antitrust violation to each purchaser of defendants' food products or to prove the amount of damages each such person suffered as a result of the violation. Indeed, it is possible that few individuals ultimately would be able to prevail on all of the essential elements necessary to obtain a judgment for damages.

Different facts would have to be proved to establish a Sherman Act violation under each of the three complaints. In *OPIC* plaintiffs alleged that 15 defendants conspired to fix prices on the sale of unspecified food *products* in Cuyahoga County, Lake County and Summit County, Ohio, "between 1972 and the date of the filing of the [c]omplaint". In *Rosen* the same basic violation is alleged with respect to sale of similarly unspecified food *products* in Lorain County, Ohio between 1972 and the date of the filing of that complaint. In *Parrish* it is claimed that *five* defendants conspired to "fix prices charged for [unspecified] *food* within their respective territorial and geographical markets in violation of the Sherman Act and Clayton Act ... for an indeterminate period." Each of the three complaints, therefore, alleges a different area in which asserted violations occurred, a different combination of defendants and a different time period. There is no way to determine whether the products would ultimately be the same. Obviously, each complaint would involve different facts to prove the violation alleged.

Defendants have, throughout these proceedings, consistently denied their culpability. Even in the context of this settlement, the stipulation specifically states that the signatory defendants do not acknowledge liability. The government action filed against some of the same defendants, *United States v. Fisher Foods, Inc., et al.,* CR 80–175 (N.D. Ohio) does not significantly help the plaintiffs. The civil actions and the criminal indictment involve different products, different time periods, different geographic areas and not all of the same defendants. The government's criminal action against two corporations, one association and four individuals, following an eighteen-month grand jury investigation, asserted a conspiracy only as to "*certain grocery products* and *some meat items*" for two brief periods (1976–1977 and 1978–1979) in Cuyahoga County, Ohio. The defendants in the criminal case have pleaded *nolo contendre* and such pleas have been accepted. In light of the numerous variables in the three cases, plaintiffs' actual ability to prove a Sherman Act conspiracy presents, at the very least, significant litigation risks.

The second element for establishing liability under section 4 of the Clayton Act is that a plaintiff must show direct injury by the Sherman Act violation. In a Sherman Act conspiracy involving a single, homogenous product, this element is usually satisfied by proof that the plaintiff (or all plaintiffs in a class action) purchased the product, the price of which was fixed. In a multiple product case, or in a market involving similar but not identical products sold to similar types of customers, a generalized proof of impact to a large group of purchasers becomes increasingly difficult to prove. *See, In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357 (N.D. Ga. 1979), *rev'd in part on other grounds,* 645 F.2d 488 (5th Cir. 1981); *Alabama v. Blue Bird Body Co., supra.*

In the instant cases, there are several factors that would make it extremely difficult for any given plaintiff, or the classes the plaintiffs represent, to adduce evidence sufficient to satisfy the fact of injury element. There are over 15,000 food products available to shoppers in the defendants' stores on a daily basis. To satisfy the fact of injury element and successfully pursue the class action, plaintiffs would have to prove either that all "food products" or "food," or a specified number and kind of each, were the subject of the price-fixing arrangement and also that each plaintiff bought certain amounts of such products from the defendants. There is no question that this burden would not be an easy one to meet.

Each shopper in defendants' stores buys a different product mix from those of other shoppers. That mix varies among the shoppers from one buying day to the next, from store to store, by ethnic and age groups and by economic status, and varies for the same shopper over time. Because of the divergent nature of shoppers' buying practices and habits, such proof might be on an individual basis, which would make proof of injury-in-fact more difficult.

The numerous products offered by defendants and their other competitors also vary in price significantly among brands and over time. The prices charged reflect cost factors, competitive conditions, advertising and promotional programs, and changes in buyers' preferences and demands. Many product prices are changed almost weekly. To determine impact, the plaintiffs would have to convince a jury that the prices for the products subject to a price-fix increased above what they would have been absent the alleged agreement.

Furthermore, it is apparent that much of plaintiffs' proof would have to be drawn from documents no longer available. Defendants' price change books and price change bulletins are not retained for any significant period of time. Newspaper advertisements which are available are not particularly helpful inasmuch as space limitations preclude advertisement of all but a small percentage of food or food products offered for sale at any one time. Finally, it is highly unlikely that many shoppers have sales receipts for any significant period of time between 1972 and 1980, or that such sales receipts would provide sufficient proof of the type let alone the brand, of his selection of the 15,000 food products available for purchase. In short, the proof of impact upon either an individual shopper or a class of shoppers from 1972 to 1980 would be difficult. Yet absent such proof, no recovery by plaintiffs or their classes would be legally permissible.

The third element—the amount of damage suffered by the individuals making up the class—may be the most formidable barrier to plaintiffs if they were required to try this case. This barrier is created by two significant proof problems for the class plaintiffs: first, they may have to present proof of the amount of damages not on a class-wide basis, but rather for each and every shopper who purportedly is a member of the class, and, second, the proof required might be by *actual* evidence of purchases of the price-fixed products by each of these shoppers.

In addition to these substantive evidentiary problems, there are class action issues which have not been resolved. Defendants have strenuously contested whether these lawsuits, which potentially involve a million class members and thousands of products, can be managed as class actions. Defendants have cited the problems of proof of individual damages, identification of the class members, and distribution of any recovery as being insurmountable obstacles to the maintenance of these actions. If this Court ultimately agreed with the defendants on any of these issues, plaintiffs' class claims might be entirely dismissed and there would be no recovery by the class. Obviously, plaintiffs must surmount many barriers to reach a trial of these actions and to prevail.

### The Range of Possible Recovery if Plaintiffs Prevailed at Trial.

The "educated estimates" of possible damages prepared by competent and qualified economic consultants are suitable for the Court's consideration in evaluating the settlements. *See, Miller v. Republic National Life Ins. Co.,* 559 F.2d 426, 429 (5th Cir. 1977), *quoting from Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). *See also, Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied, sub nom. Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). Although the amount of proven damages would be trebled in the event that defendants were judged liable therefor, the sufficiency of an antitrust settlement may properly be evaluated by comparison to possible single dam-

ages. *See, e.g., City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 458–59 (2d Cir. 1974).

### a. *The Preston Report*

In order to estimate the damages arguably sustained by members of the alleged classes in these cases, the defendants retained the services of Dr. Lee E. Preston of the University of Maryland, who is a nationally recognized independent expert in both the economics of the food industry and antitrust damages. Utilizing a net profit margin analysis of data available from Fisher and Pick-N-Pay, Dr. Preston's opinion was that defendants' collective maximum exposure for damages is no greater than $7,200,000. He further concluded that the formula, methods, hypotheses and calculations used by the plaintiffs' expert, Dr. James Zinser, were seriously flawed and did not support his conclusions that potential damages to the class were of a greater magnitude.

### b. *The Zinser Report*

Dr. James Zinser, plaintiffs' economic expert, prepared an analysis of the damages which might have been suffered by customers of the three settling defendants. Using two different methods of analysis, Dr. Zinser concluded that the range of damages suffered by those consumers was between $20 million and $37.9 million (before trebling).

Dr. Zinser's conclusions represent the gross amount of damages sustained by consumers without reference to the legal restrictions which act to limit the recovery of damages in class action litigation. For instance the report does not deal with such questions as legal limitations on the damage class, a possible restriction of liability to Cuyahoga County, or the ability of each class member to prove in Court the amount and nature of his purchases and the damage he sustained.

While members of most households in Northeast Ohio patronized the settling defendants' stores at some point during the time frame at issue, the group of customers most easily ascertainable for notice purposes are those who appear on settling defendants' records of individuals having checkwriting privileges. Estimates of the percentage of settling defendants' customers who have such privileges ranges from 12% to 20%, and at best encompasses a relatively homogenous group that is sufficiently affluent to maintain a banking account. Had these suits proceeded to trial on the merits, it is possible that a majority of those injured by any conspiracy—those who purchase groceries with cash or food stamps—might have been precluded from any recovery. Assuming a class of the maximum estimate of 20% check-writers out of total purchases, the range of provable damages using Dr. Zinser's analysis and figures would be $4.3 million to $7.6 million before trebling.

Whether the ultimate class certified prior to trial consisted of check-writers in Northeast Ohio or of all customers, their actual damage recovery might very well be limited to a percentage of their provable purchases. Check-writers, or any other consumer, who could not produce either 1) checks written to a settling defendant in the exact amount of a purchase, or 2) cash register receipts from a settling defendant during the conspiracy period might recover nothing. The class recovery at trial might be limited to a percentage of the purchases which all individual class members could prove. Even ignoring the administrative problem that proof of each individual's damage would cause, it is obvious that a requirement of individual proof would further reduce the range of possible recovery for the class at trial.

### *Other Factors To Be Considered.*

The proposed $20,000,000 settlement compares very favorably to the range of possible recovery, even without considering the other factors described in *Corrugated Container.* When those other factors are considered, it is even more obvious that the proposed settlement is fair, adequate and reasonable.

### 1. *The Complexity, Expense and Likely Duration of the Litigation.*

No one can underestimate the complexity of an antitrust class action that potentially

involves one million class members and thousands of grocery products. Virtually every issue in these actions, no matter how insignificant, has become the subject of intense dispute and debate. There are legal issues unique to this litigation which foreseeably would necessitate interlocutory appeals which would delay even the most stringent trial schedule. This factor, coupled with the massive scope of discovery, makes it highly unlikely that there would be any distribution to the class earlier then five years from now.

The cost of merely printing, mailing, and publishing the First Notice was approximately $200,000.00. If these actions were prosecuted through the trial and appeal, that cost would have to be borne by plaintiffs and would rapidly be surpassed by the inordinate expenses of depositions, document copying, transcripts and fees of expert witnesses.

### b. *The Reaction of the Class.*

The reaction of the class members of the proposed settlement has been extraordinarily supportive. Out of the 1,122,422 class members who received the First Notice by mail (approximately 1,040,000 households and 82,000 businesses), only 3,060 Requests for Exclusion were returned, representing only 0.27%. Even more significant is the fact that *not one* of the 1.1 million class members filed an objection to the proposed settlement which complied with the requirements of this Court's order. There can be no question but that the proposed settlement has been well received by the class members.

### c. *Stage of Proceedings.*

The proposed settlement was reached after approximately two years' of litigation. While plaintiffs' formal discovery efforts had been thwarted by defendants' strenuous opposition, plaintiffs have obtained sufficient data and other information through settlement agreements with Stop-N-Shop and HM Liquidating, Inc. and the materials supplied by settling defendants under the stipulated protective order filed August 12, 1982, to evaluate the potential damages to the class.

### d. *Opinion of Counsel and the Court's Expert.*

The Court cannot overlook the fact that all counsel represent, and the Court's own expert has testified, that it is their opinion (which is to be given great weight by the Court) that the settlement reached is fair, reasonable and adequate. *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

### e. *The Proposed Method of Distribution.*

The Court is also convinced that the proposed method of distribution of the settlement is the best way to maximize any recovery achieved by the alleged classes. Although some class members might have preferred cash to Food Certificates, an equivalent cash settlement of these actions was not possible. As defendants' counsel repeatedly made clear during settlement negotiations, defendants simply could not and would not raise anything approaching $20,000,000.00 in cash to settle these cases. Any preference for cash was therefore an unrealistic objective if any class settlement was to be achieved in the range of value represented by this settlement. Further, in similar class actions, settlements have been reached and approved under which the claims were resolved by the issuance of certificates. *See, Butkowsky v. Prince Georges County Board of Realtors*, 4 Class Action Reports 242 (D. Md. 1972); *James v. Phoenix Real Estate Board, Inc.*, 714 BNA Antitrust & Trade Reg. Rep. A–6 (D. Ariz. 1976).

The proposed method of distribution will maximize the value of the recovery actually received by the class. The $20,000,000.00 is the net distribution to the class, with settling defendants paying all cost of notice, litigation, distribution, administration, experts' fees and attorneys' fees from an additional fund. The members of the (b)(3) settlement class will actually receive $20,000,000.00 in value. Most importantly, the maximum number of consumers who were injured, not merely the check-writer, will share in the recovery.

Plaintiffs were able to avoid the costs of identifying the names of individual members of the class, of determining which members of the household actually made the household's purchases of grocery products, of determining the extent of each household's individual damages, of determining which class members have left Northeast Ohio or have moved into Northeast Ohio since the relevant period. The costs of determining those facts would have consumed a substantial portion of any recovery, leaving less for actual distribution to the class.

For the reasons articulated above, this Court has found that the proposed settlement is fair, reasonable and adequate. In fact, as the analyses of plaintiffs' expert and defendants' expert indicate, the proposed settlement may very well exceed the amount of any damages actually recoverable by class members. The proposed settlement will distribute the class' recovery many years before the class members could expect to receive any money from a successful trial, and the proposed settlement will result in a far greater portion of the recovery actually being received by the class members.

IT IS SO ORDERED.