Ronald J. THOMPSON, M.D., et al. Plaintiffs,

v.

**MIDWEST FOUNDATION INDEPENDENT PHYSICIANS ASSOCIATION d/b/a ChoiceCare, et al. Defendants.**

No. C–1–86–744.

United States District Court, S.D. Ohio, W.D.

Dec. 4, 1988.

See also, D.C., 117 F.R.D. 108.

Stanley M. Chesley, Waite, Schneider, Bayless & Chesley Co., L.P.A., W.B. Markovits, and James R. Cummins, Amy Grossman Applegate, Cincinnati, Ohio, for plaintiffs.

Stephen J. Butler, Glenn V. Whitaker, Leo J. Breslin, Lindhorst & Dreidame Cincinnati, Ohio, John E. Martindale, Gail E. Sindell, Barbara Friedman Yaksic, Benesch & Friedlander, Columbus, Ohio, and Jeffrey A. Key, Cleveland, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HERMAN J. WEBER, District Judge.

### BACKGROUND

1. On August 15, 1986, the named plaintiffs filed this action, alleging, *inter alia*, that the Defendants, Midwest Foundation Independent Physicians Association d/b/a ChoiceCare ("ChoiceCare," the not-for-profit health maintenance organization), Ste-

phen P. Hogg, M.D. ("Hogg"), Kerry D. Tarvin ("Tarvin") and ChoiceCare Corporation ("Corp.," a for-profit corporation), engaged in federal antitrust, securities, and racketeering law violations.

2. Defendants filed an answer and counterclaim, denying Plaintiffs' claims and bringing counterclaims for federal antitrust violations, breach of contract, defamation, and tortious interference, and seeking $45 million as damages.

3. Following institution of the suit, all parties engaged in extensive discovery, including the taking of one hundred and four individual depositions, as well as the production and review of over a million pages of documents.

4. On September 4, 1987, this Court conditionally certified the case as a class action (*see* doc. # 114), while at the same time dismissing without prejudice Plaintiffs' state law claims. These claims were brought in a related suit styled *Bernstein, et al. v. Midwest Foundation Independent Physicians Association, d/b/a ChoiceCare, et al.* ("Bernstein"), Case No. A8706855, in Hamilton County Court of Common Pleas. Defendants also raised counterclaims against certain Plaintiffs in the *Bernstein* case.

5. The trial of Plaintiff's federal claims began in this Court on November 16, 1987, and continued until the jury reached a verdict on March 14, 1988. The jury found that the Defendants had violated federal antitrust, securities and RICO laws, and awarded damages which, after mandatory trebling, amounted to $101,868,014.

6. Prior to any entry of final judgment, on April 11, 1988, Defendants filed a motion for judgment notwithstanding the verdict, asking that the Court overturn the jury verdict, or in the alternative, requesting a new trial, on the basis of alleged errors committed during the trial process. Plaintiffs filed briefs in opposition. The Court did not enter a final judgment entry, or rule on the motions, pending settlement discussions among the parties.

7. On November 1, 1988, this Court modified its prior order of September 4,

1987, and, based upon the joint motions of the Plaintiffs and Defendants, asserted pendent jurisdiction over all state law claims as contained in Plaintiffs' initial Amended Complaint and Defendants' Amended Counterclaims, and granted mandatory class certification of all claims in Plaintiffs' Amended Complaint, pursuant to Rule 23(b)(1)(A) and Rule 23(b)(1)(B), Fed. R.Civ.P. The class has been defined as "All physicians who (1) have at any time through March 31, 1987 entered into a provider agreement with the Midwest Foundation Independent Physicians Association d/b/a ChoiceCare, or (2) have purchased any shares of ChoiceCare Corporation stock pursuant to an offering circular dated February 15, 1985."

8. On October 31, 1988, the parties reached the proposed settlement agreements which have led to the present proceeding. An "Amended and Restated Agreement" was reached among Plaintiffs' counsel, Hogg and Tarvin ("Hogg and Tarvin Agreement"), and an Agreement was reached among Plaintiffs' counsel, Choice-Care, and Corp. ("Agreement") (collectively, the "Settlement Agreements").

### REQUIREMENTS FOR CLASS ACTION SETTLEMENT

9. In order to settle a class action lawsuit, prior court approval is required, pursuant to Fed.R.Civ.P. 23(e). Rule 23(e) provides:

> Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

■ 10. There are three steps that must be taken by the court: 1) the court must preliminarily approve the proposed settlement; 2) members of the class must then be given notice of the proposed settlement; 3) a hearing must be held, after which the Court must decide whether the proposed settlement is fair, reasonable and adequate. *Williams v. Vukovich,* 720 F.2d 909 (6th Cir.1983); *Stotts v. Memphis Fire Department,* 679 F.2d 541 (6th Cir.1982), *reversed on other grounds, sub nom. Firefighters Local Union No. 1784 v. Stotts, et al.,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *Bronson v. Board of Education of the City School District of the City of Cincinnati,* 604 F.Supp. 68 (S.D. Ohio 1984).

### PRELIMINARY APPROVAL

■ 11. Preliminary approval of a proposed settlement is based upon the court's familiarity with the issues and evidence, as well as the arms-length nature of the negotiations prior to the proposed settlement, ensuring that the proposed settlement is not illegal or collusive. *Bronson,* 604 F.Supp. at 71; *Stotts,* 679 F.2d at 551; *United States v. City of Miami,* 614 F.2d 1322, 1330–31 (5th Cir.1980), *modified on reh'g,* 664 F.2d 435 (5th Cir.1981). Once the court has given preliminary approval, an agreement is presumptively reasonable, and an individual who objects has a heavy burden of demonstrating that the decree is unreasonable. *Bronson,* 604 F.Supp. at 71; *Stotts,* 679 F.2d at 551, *Miami,* 614 F.2d at 1333.

12. On November 1, 1988, this Court preliminarily approved the proposed settlement agreement. This Court based its preliminary approval on its familiarity with the evidence, problems and issues presented in this case, and the character of the negotiations. This Court concluded that the proposed settlement agreement was neither illegal nor collusive, and that it was the product of decidedly arms-length negotiations.

### *Notice of the Proposed Settlement*

13. Notice to the members of the class, both of the proposed settlement and that a hearing would be held to determine whether the settlement was fair, adequate and reasonable, is required. *Bronson,* 604 F.Supp. at 71; *Vukovich,* 720 F.2d at 921; *Stotts,* 679 F.2d at 551.

14. Contemporaneous with its preliminary approval of the proposed settlement, this Court approved the form of notice proposed by the parties, and ordered that

on November 2, 1988, the approved form of notice be sent by Defendants to each class member, at his or her last known address. *See* docket # 334. The notice was published as directed. (November 30, 1988 hearing, Plaintiffs' Exh. # 1). In addition to such notice, members of the class and other interested persons received notice through publicity. The case is of great public interest, and it has been covered in depth by the Cincinnati media.

■ 15. Because the names and last known addresses of all class members were available from ChoiceCare's business records, the mailing of the notice of the proposed settlement agreement and the fairness hearing scheduled for November 30, 1988 was the best notice practicable under the circumstances. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The notice was sufficient to allow members of the class, "a full and fair opportunity to consider the proposed decree and develop a response." *Vukovich*, 720 F.2d at 921.

## THE FAIRNESS, REASONABLENESS AND ADEQUACY OF THE PROPOSED SETTLEMENT

■ 16. On November 30, 1988, the Court held a hearing in order that the parties and class members could comment on the proposed settlement agreement. Based upon the testimony adduced at that hearing, the evidence before it, and the Court's familiarity with this matter, the Court finds that the proposed settlement agreement is fair, reasonable and adequate.

■ 17. The law generally favors and encourages the settlement of class actions. *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir.1981), *vacated on other grounds and modified*, 670 F.2d 71 (6th Cir.1982).

■ 18. The Court is not required to reach ultimate conclusions of fact or law on the issues in the case, but instead should examine the overall fairness and adequacy of the settlement in light of the likely outcome and costs of continued litigation.

*Ohio Public Interest Campaign v. Fisher Foods*, 546 F.Supp. 1, 6–7 (N.D.Ohio 1982), *In re Art Materials Antitrust Litigation*, 100 F.R.D. 367, 370 (N.D.Ohio 1983); *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.1975), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

■ 19. In assessing the fairness, reasonableness and adequacy of a settlement agreement, the Court must consider various factors. *Bronson*, 604 F.Supp. at 73; Manual for Complex Litigation, § 1.46 at 56 (5th ed. 1982); 3 B. Moore, Federal Practice, ¶ 23.80[4] at p. 23–520 to 23–525.

20. The factors to be assessed may include: "Plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement; the complexity, expense and likely duration of the litigation, and the state of the proceedings and the amount of discovery completed, the judgment of experienced trial counsel, the objections raised by class members, the nature of the negotiations, and the public interest...." *Bronson*, 604 F.Supp. at 73; *Carson v. American Brands*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981); *Vukovich*, 720 F.2d at 922; *Stotts*, 679 F.2d at 552.

■ 21. A class action settlement cannot be measured precisely against any particular set of factors, however, and the court may be guided by other factors, "the relevancy of which will vary from case to case." *Ohio Public Interest Campaign v. Fisher Foods*, 546 F.Supp. 1, 6–7 (N.D.Ohio 1982).

## PLAINTIFFS' LIKELIHOOD OF ULTIMATE SUCCESS ON THE MERITS BALANCED AGAINST THE RELIEF OFFERED BY THE PROPOSED SETTLEMENT AGREEMENT

22. Despite having obtained a jury verdict of approximately $102 million, Plaintiffs face risks in continuing forward with this litigation. Defendants have continuously and emphatically denied their culpability. Plaintiffs still face the possibility

that the verdict could be modified by post-trial motions or appeal. This Court has not yet caused the jury verdict to be entered as a final judgment. Defendants' Motion for a Judgment Notwithstanding the Verdict is pending before the Court wherein Defendants argue, in part, that evidence adduced at trial was legally insufficient to create issues of fact for jury determination as to: conspiracy to fix prices; price fixing *per se;* price fixing damages; antitrust injury; intent to unreasonably monopolize; actual monopolization; securities fraud damages; nexus between racketeering and the predicate acts; damage from the RICO claims; and RICO enterprise and pattern of racketeering activity.

23. Should Defendants appeal, even if Plaintiffs should prevail in the appellate process, the appeal and delay could injure ChoiceCare, making any substantial monetary recovery unlikely. A post-trial appeal would tax the resources of all the litigants. Even if ChoiceCare does not appeal, an attempt by Plaintiffs to collect on a judgment could result in the bankruptcy of ChoiceCare, or protective liquidation or other action by the Ohio Department of Insurance, preventing substantial monetary recovery. Moreover, continuing forward with the litigation would continue to expose Plaintiffs to the counterclaims of Defendants.

24. In addition to monetary recovery, Plaintiffs sought by this litigation to obtain certain equitable relief, to provide for certain changes in the leadership and governance of ChoiceCare. Further litigation would jeopardize ChoiceCare's continued operation, threatening Plaintiffs' ability to achieve these goals.

25. Balanced against these risks posed to Plaintiffs by continuation of the litigation, the proposed settlement agreement is fair, adequate, and reasonable. In terms of monetary recovery, the terms of the proposed settlement provide for payments which take into consideration the current and future ability of the defendants to pay, a relevant factor. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974). After extensive inquiry into ChoiceCare's finances, the parties have jointly concluded that ChoiceCare could not pay greater amounts or more quickly, without threatening ChoiceCare's financial viability.

26. The proposed settlement is not limited to monetary recovery, however, but includes substantial non-monetary relief sought by Plaintiffs. Dr. Hogg and Mr. Tarvin have resigned, and the ChoiceCare Board of Trustees will resign, to be replaced by a Board that will ultimately be chosen directly by participating providers. The for-profit conversion, opposed by Plaintiffs, will not take place, and ChoiceCare will remain a non-profit organization. For the next ten years, any conversion, sale of assets, merger, consolidation, management agreement, or other activity which would substantially adversely affect the reimbursement rights of the Plaintiff class, will only take place with approval of the Plaintiffs, unless obligations to the Plaintiffs and their attorneys totalling $65,500,000 have been paid.

## THE COMPLEXITY, EXPENSE AND LIKELY DURATION OF THE LITIGATION.

27. This action has been extremely complex and expensive, requiring well in excess of fifteen thousand hours of attorneys' services, and necessitating costs and expenses to Plaintiffs, alone, of over $400,000, exclusive of attorney time.

28. The action has already proceeded for more than two years, with settlement negotiations alone proceeding for nine months following the verdict. An appeal would be time consuming and expensive for both parties. Even without an appeal, attempts to collect on a judgment would be similarly time consuming and expensive.

29. The proposed settlement allows the Plaintiffs' goal of restructuring ChoiceCare to proceed in a timely manner, as well as providing the best possibility for a timely compensation of the actual damages claimed.

## THE STAGE OF THE PROCEEDINGS, AND OPINION OF COUNSEL

30. As previously stated, extensive discovery was conducted by the parties prior

to trial, and the parties have continued to exchange information during the negotiation process. The proposed settlement was not a hurried agreement, but rather was reached after approximately nine months of intensive, post-trial negotiations. Because of the stage of the proceedings, competent, experienced counsel for Plaintiffs were able to enter into this agreement with full knowledge of the strengths and weaknesses of their case, given the various post-trial possibilities, including appeal. Plaintiffs' counsel is extraordinarily experienced in class action matters, as well as antitrust, securities, RICO, and corporate finance and governance issues generally. Based on these facts, the opinion of Plaintiffs' counsel that the proposed settlement agreement is fair, adequate and reasonable is an important factor in the Court's consideration.

## THE NEGOTIATION PROCESS

31. The proposed settlement was the result of intense, arms-length negotiations between the parties. The proposed settlement agreement suggests no bias, collusion or coercion in favor of any party or subgroup of class members.

## OBJECTIONS RAISED BY CLASS MEMBERS

32. A court should not withhold approval merely because some class members object to it. *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir.1975) *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), *Bronson*, 604 F.Supp. at 73.

33. In considering the extent of opposition, the Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis. *Armstrong v. Board of School Directors*, 616 F.2d 305, 315 (7th Cir.1980), *Bronson*, 604 F.Supp. at 78.

34. In response to the Notice of Settlement provided to all Class Members, the only timely and properly filed objection, either written or by personal appearance at the scheduled hearing, was presented by Dr. William B. Monnig, who presented a written "Response to the Notice of Settlement," ("Response") with signatures of approximately one hundred Northern Kentucky physicians. Dr. Monnig is a Choice-Care participating physician from Northern Kentucky, is the Chairperson of Choice-Care's Kentucky Physicians Advisory Committee, and is a board member of PruCare, a competing health maintenance organization. Dr. Monig is not a shareholder in ChoiceCare Corp., and his ·response does not object to the settlement involving Corp., Hogg, or Tarvin.

35. Dr. Monnig's written Response raised thirteen issues concerning the settlement. However, following a meeting with Plaintiffs' counsel and following presentation by counsel for all parties at the hearing, Dr. Monnig stated that five of these issues had been adequately explained and addressed, leaving only eight issues that remained a concern to him.

36. Counsel for Plaintiffs voiced their belief that none of Dr. Monnig's concerns raised on behalf of the Kentucky physicians' group stated a valid objection to the proposed settlement. Counsel for Defendants did not support any of Dr. Monnig's concerns. Many of the concerns raised did not address issues which were the subject of the litigation, or involved matters best left to determination under the future governance of ChoiceCare. The Court agrees with the assessment of counsel, and addresses each of the eight concerns below.

37. The first concern raised by Dr. Monnig was that the settlement of the suit was negotiated without adequate input from the participating physicians of Northern Kentucky. The settlement is designed, however, to benefit the class as a whole and does not discriminate against any group of physicians. The Court further notes that the settlement contemplates that all financial information for ChoiceCare and its subsidiaries be prepared on a consolidated basis for purposes of the settlement. The class representatives were consulted as the settlement was negotiated, and one of the six representatives is Dr. Ronald Thompson, a Northern Kentucky physician. Two Northern Kentucky physicians, Dr. Donald J. Swikert and Dr. James Linne, are on the

Board of ChoiceCare that approved the settlement.

38. The next concern raised by Dr. Monnig was that the price fixing verdict should be appealed, because he believed it to be the predominant reason given for allowing participating physicians only a minority representation on the new Board of Trustees. Counsel explained, however, that it is an important aspect of the settlement that a majority of the new Board consist of independent business and community leaders who are qualified to run ChoiceCare as a business. As a result of the settlement, physicians will now have the right to elect the members of the Board of Trustees, and will have the ability to nominate their own candidates for the Board upon presentation of a petition with fifty or more signatures. In addition, all parties testified that further appeal would entail further expense and further risk to all parties' interests, particularly ChoiceCare's.

39. Dr. Monnig's next concern was that the settlement allows payment of legal fees that are excessive and that will cause the plan to keep participating physicians' reimbursement at an unacceptable discounted level for the foreseeable future. This concern was the basis of the response made by letter from Dr. Jeffrey Wachsman, postmarked November 30, 1988, and received by this Court on December 1, 1988, which letter is entered as Document Number 342 in this case. This letter was not served upon or copied to the parties. As described in more detail below, this Court has approved the attorneys' fees as reasonable, in accordance with established principles of law and the quality of the work done. Moreover, the reimbursement amount paid to participating physicians is not linked to the payment of legal fees. The new Board could determine to reimburse participating physicians at their full fee level, without any discount, whenever it so chooses.

40. The next concern stated by Dr. Monnig was that the settlement creates the inconsistency of dictating that ChoiceCare will remain a non-profit company but not addressing the status of ChoiceCare of Kentucky which is a wholly owned for-profit Kentucky corporation. Under the settlement, the status of ChoiceCare, as a nonprofit corporation, and the status of ChoiceCare of Kentucky, as a wholly owned for-profit Kentucky corporation, remain unchanged. Any future change in either's status is a decision left to the business judgment of the Board, or the vote of the members.

41. The next concern stated by Dr. Monnig was that the settlement mandates a new Board that is elected yearly by the participating physicians but gives the power to create the nominating committee of the Board to the Board itself. Although the Board has the power to select the nominating committee, no member of the nominating committee may be a then-current Trustee. In addition, any 50 voting members of ChoiceCare may nominate one or a slate of candidates for election to the Board. Thus, it is less likely that the Board will be self-perpetuating.

42. The next concern stated by Dr. Monnig was that the settlement requires the CEO of the company to be a non-participating physician who is appointed by the Board of Trustees. The revised Articles and By–Laws provide that the President (who is the Chief Executive Officer) of ChoiceCare is to be appointed by the Board, but there is no requirement that the President be a non-participating physician.

43. The next concern stated by Dr. Monnig was his belief that the settlement does not adequately define net worth and that definition will determine whether future participating physicians will be paid their agreed upon fees in full before the subrogated debts including legal fees for this suit will be paid. Under the settlement, "net worth" is adequately defined, and the decision whether to pay future participating physicians their fees in full will be made by the new Board independent of the determinations pursuant to the Agreement upon which payments of legal fees and other ChoiceCare debts are conditioned.

44. The final concern stated by Dr. Monnig was that the settlement fails to address the issue of the validity of the

participating physician contracts and whether those contracts should be renegotiated. This question was not part of the jury verdict. This is a business issue that any physician will be able to raise with the new Board.

## THE PUBLIC INTEREST

45. ChoiceCare is the largest health maintenance organization in the Greater Cincinnati area, with over 100,000 subscribers.

46. The public interest, including the interests of ChoiceCare subscribers, lies in resolving this dispute as expeditiously as possible, so that any uncertainty regarding ChoiceCare's continued operations is dispelled, and in resolving it in a manner that does not threaten the care to be given to ChoiceCare subscribers. The proposed settlement accomplishes both of these objectives: the dispute will be resolved, and will be resolved in a manner which, according to all parties, does its best to ensure that ChoiceCare can continue to give care to its subscribers.

### Other Factors

47. ChoiceCare has been under the supervision of the Ohio Department of Insurance since shortly after the verdict of March 14, 1988. The Ohio Department of Insurance has reviewed the settlement process, and the proposed settlement agreement, and has approved it pursuant to its statutory authority. (*see* doc. # 344). The office of the Ohio Attorney General has also reviewed the proposed Settlement Agreements, and has no objection. This is an important factor for the court's consideration in determining the fairness of the proposed settlement. *See Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir.1977)

48. ChoiceCare was incorporated April 20, 1978 as an Ohio not-for-profit organization. Since its inception it has operated as an HMO for the purpose of offering to the public an alternative health care delivery system. From its inception and up to and including the time of the trial herein, ChoiceCare has, in fact, provided needed services to the community, and has not acted in a manner inconsistent with its purpose of affording the public an alternative health care delivery system.

49. The settlement is fair, reasonable and adequate in part because it does not change the not-for-profit structure and social welfare purpose of ChoiceCare. In light of the $102,000,000 jury verdict and significant exposure to ChoiceCare, this Court finds that the maximum payout under this settlement of $65,500,000, coupled with terms which are calculated to protect ChoiceCare's ability to continue to maximize its chances of continuing in its social welfare purpose, is fair, reasonable and adequate. The settlement provisions give the Class Members payment rights solely as contingent creditors of ChoiceCare. Along with other safeguards built into the settlement, the Department of Insurance will ensure that no payments or actions under the settlement unduly threaten the financial viability of ChoiceCare.

50. ChoiceCare instituted a "withhold system" for the Class Members from its inception up to March 31, 1987. Under this system, a certain percentage of remuneration earned by physicians and to which they would have otherwise have been entitled was withheld from payment to the Class Members in order to assure ChoiceCare funds to meet its expenses. The total amount withheld from the Class Members from the inception of ChoiceCare until March 31, 1987, was approximately $28,000,000. In addition, in order to control costs, ChoiceCare paid many individual physicians at less than a 90th percentile rate for specific procedure and services they provided. The approximate amount, in the aggregate, of payment to the Class Members at less than a 90th percentile rate was $4,000,000.

51. ChoiceCare, in its Settlement Agreement, has agreed to repay to the Class Members the aforementioned $32,000,000 (minus attorneys' fees), which the Class Members had previously earned but which had not been paid to them. Since the Class Members have previously earned this amount, and ChoiceCare does not have an

obligation to repay them until it reaches a significant net worth level, this Court has taken these facts into consideration in finding that the Settlement Agreement is fair, reasonable and adequate.

## ATTORNEYS' FEES

52. The amount of attorneys' fees must be approved by the court at a hearing on settlement of class action. *Parker v. Anderson*, 667 F.2d 1204 (9th Cir.1982), *cert. denied* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65.

53. Factors to consider in analyzing propriety of attorneys fees in connection with settlement of class action include the time and labor expended by counsel, the magnitude and complexity of the litigation, the risk of the litigation, the quality of representation, and the requested fee in relation to the settlement. *Warner Communications Securities Litigation*, 618 F.Supp. 735 (S.D.N.Y.1985), *aff'd* 798 F.2d 35 (2nd Cir.1986); *NorthCross v. Board of Education of Memphis City Schools*, 611 F.2d 624 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980); *In re Beverly Hills Fire Litigation*, 639 F.Supp. 915 (E.D.Ky.1986); *In Re: Cenco Securities Litigation*, 519 F.Supp. 322 (N.D.Ill.1981).

54. The Court's active involvement in the supervision, management, and trial of this litigation during the past two years places the Court in a prime position to evaluate the amount and propriety of the attorneys fees awarded to Plaintiffs' counsel under the proposed settlement.

55. Plaintiffs' counsel accepted this case upon a contingent basis, entailing a financial risk totalling $3,249,546.25 of attorney time that only two firms have borne over more than a two year period. The case involved novel issues under federal antitrust, securities, and racketeering laws, as well as complex financial analysis of corporate valuation, corporate control, and HMO activity. It is clear from both the time records submitted and the Court's observation that Plaintiffs' counsel spend a great deal of time and effort in preparing this large and complex case, and did so both efficiently and with great expertise.

56. In commencing this litigation, the Plaintiffs sought to assure that ChoiceCare would not be converted to a for-profit corporation through a purchase by Corp.; to assure that new leadership would be selected to operate ChoiceCare as a non-for-profit corporation; to assure that a permanent write-off of the providers' withholds would not be accomplished by ChoiceCare; and to assure the payment by ChoiceCare of usual, customary and reasonable rates.

57. After a lengthy trial, lasting approximate four months and over forty trial days, Plaintiffs obtained a jury verdict of approximately $102 million. Counsel for Plaintiffs then entered into settlement negotiations with the Defendants in order to ensure a result that would be in the best interests of the Plaintiff Class. Plaintiffs' counsel then spent a great deal more time and effort in negotiating the terms of the settlement approved herein. In negotiating the terms of the approved settlement, Plaintiffs' counsel have accomplished all of the goals Plaintiffs had originally sought to secure. The fees proposed under the settlement plan are proper in relation to the substantial benefits, both monetary and otherwise, received by the physician class members.

58. The work of Plaintiffs' counsel, throughout the entirety of the litigation, has been of the highest quality. The initial payment to Plaintiffs' counsel at the time of settlement will not even compensate for the hourly rates of legal services provided. The remaining payments, which bear no interest and will not be adjusted to reflect the present value of said payments, will be made over time. These payments are also contingent in nature, structured so as to minimize any potential adverse effect on ChoiceCare's business operations. Moreover, even if these future, contingent payments were to be paid immediately, the total fees would be well within the multipliers awarded counsel in analogous cases. *In re Beverly Hills Fire Litigation*, 639 F.Supp. 915 (E.D.Ky.1986) (multiplier of 5 awarded); *In Re: Cenco Securities Litiga-*

*tion,* 519 F.Supp. 322 (N.D.Ill.1981) (multiplier of 4 to lead counsel).

59. The Court has heard counsel on behalf of Plaintiffs and counsel on behalf of Defendants, and having reviewed all of the submissions presented with respect to the Petition of Plaintiffs' Counsel for awards of fees, costs, and expense reimbursements, and having reviewed the affidavits, schedules and exhibits submitted in support thereof, the Court finds that the payment of fees, costs and expenses to the Plaintiffs' counsel pursuant to the terms of the Settlement Agreements is appropriate.

## ORDER

Consistent with the foregoing, the Court having heard counsel on behalf of the Plaintiffs and the Defendants, and having heard and considered the objections, and having reviewed all submissions presented with respect to the proposed settlement, and having considered the Petition of Plaintiffs' counsel for an award of fees, costs and expense reimbursements, and having reviewed the schedules and exhibits in support thereof, and upon the entire record and the entire docket herein, it is hereby

ORDERED, ADJUDGED, AND DE-CREED THAT:

1. The proposed settlement, as provided for by the Settlement Agreements dated October 31, 1988, is in all respects fair, reasonable and adequate, and is approved.

2. The attorneys' fees and expenses provided for in the Settlement Agreements are reasonable, and are approved.

3. Notice to the Class required by Rule 23(e) Federal Rules of Civil Procedure has been given in an adequate and sufficient manner, complying in all respects with such Rule and due process, including, but not limited to, the form of notice and the methods of identifying and giving notice to the Class.

4. Plaintiffs, Class Members and the defendants shall consummate the settlement according to the terms of the Settlement Agreements.

5. The Settlement Agreements shall not be construed as an admission of liability of any kind, nor shall any of the findings of the jury, in the absence of a ruling and judgment from this Court, be construed as a finding of liability against any Defendant.

6. Both Plaintiffs and Defendants will have dismissed their claims against each other, prior to final verdict, with prejudice, and this case shall therefore be marked on the Docket as settled and dismissed.

7. By operation of law and the Settlement Agreements, the parties have released each other, and have released other persons identified in the Settlement Agreements, from any and all claims which were brought or which might have been brought, based on or arising from the facts alleged in the Complaint and Counterclaims.

8. It is the intention of the parties and this Court and a purpose of these Agreements that ChoiceCare shall retain its not-for-profit status and exemption from income tax until such time as the members of ChoiceCare otherwise determine. Plaintiffs' counsel represent to the Court that, based upon an opinion of the certified public accountants retained by Plaintiffs' counsel as experts in this case, who have reviewed the Agreement, the proposed amended bylaws of ChoiceCare, and other pertinent documents, the Agreement should have no effect on ChoiceCare's ability to retain its tax exempt status.

9. This Court hereby retains continuing jurisdiction in both law and equity to administer, effectuate and enforce the Settlement Agreements and to protect the parties in their agreement.

10. This Judgment shall be entered as to all Plaintiffs, Class Members and Defendants.

11. This Order approving these Settlement Agreements is a final judgment of this Court pursuant to Fed.R.Civ.P. 54(b) and the Court finds that there is no just reason to delay appeal. The Clerk of Courts is directed to enter this Order as a final judgment of this Court.

IT IS SO ORDERED.