**Katherine E. LEVELL, et al., Plaintiffs,**

v.

**MONSANTO RESEARCH CORP., et al., Defendants.**

No. C–3–95–312.

United States District Court, S.D. Ohio, Western Division.

Feb. 7, 2000.

Robert F. Laufman, Laufman & Gerhardstein, Cincinnati, OH, Gregory Mooney, Oil, Chemical & Atomic Workers, Intn'l Union AFL–CIO, Lakewood, CO, Brian P. Kenney, Timothy T. Myers, Elliott, Reihner, Siedzikowski & Egan, P.C., Blue Bell, PA, Reuben A. Guttman, Brian P. McCafferty, Provost & Umphrey, Deborah A. Solomon, Washington, DC, for Katherine E. Levell, Eddie Ford, James Goldie, William Stephens, Herbert Head, Jr., Nancy Abner, Terry NMI Gustin, Gary Nolley, Michael Gibson, Steven Schraub, James L. Turner, Oil, Chemical and Atomic Workers International Union, and Local 7–4200 OCAW.

Herbert N. Tidwell, Centerville, OH, pro se.

Norman J. Hill, Miamisburg, OH, pro se.

Richard Donovan Schuster, Vorys Sater Seymour & Pease, Columbus, OH, for Monsanto Research Corp. and EG & G Mound Applied Technologies, Inc.

Ramona C. Lee, Westlake, OH, pro se.

James Andrew Whitaker, Jr., Mason, OH, for James Hensley.

Phillis Jean Hill, Napels, FL, pro se.

Jerry N. Crawford, Lebanon, OH, pro se.

Louise Malbin Roselle, Paul M. De Marco, Waite, Schneider, Bayless & Chesley Co., Cincinnati, OH, for Frank Brewer, James NMN Reed and Eric Kirk.

Gerald R. Wirth, Miamisburg, OH, pro se.

Mary L. Brice, Dayton, OH, pro se.

William E. Weiss, Lynchburg, VA, pro se.

Dennis A. Hewitt, Aiken, SC, pro se.

Charles N. Strobert, Lighthouse, PA, pro se.

Jim Heinrichs, Springboro, OH, pro se.

George R. Gartrell, Brookville, OH, pro se.

Richard S. Carlson, West Alexandria, OH, pro se.

Clavin M. Love, Dayton, OH, pro se.

Janet B. Goode, Waynesville, OH, pro se.

Claude NMN Brown, Lewisburg, TN, pro se.

Barry M. Reed, Springboro, OH, pro se.

Neil H. Krebs, Chapel Hill, NC, pro se.

Kathern K. Hotz, Springboro, OH, pro se.

Norman J. Hotz, Springboro, OH, pro se.

Vincent Paul Popp, Popp & Tuss, Dayton, OH, for Mark A. Lerman.

Bobby D. Scearce, Franklin, OH, pro se.

Frank D. Lonadier, Dayton, OH, pro se.

Walter R. Schurman, Kettering, OH, pro se.

Ray Allen Cox, Cox, Ginger & Root, Dayton, OH, for Max Dean Christolear.

Winston F. Stewart I, Dayton, OH, pro se.

Curtis M. Watson, Dayton, OH, pro se.

Juanita Holden Holcombe, Hamilton, Los Angeles, CA, pro se.

Gerald L. Houston, West Carrollton, OH, pro se.

Charles N. Stober, Lighthouse, FL, pro se.

James Childress, Jr., Dayton, OH, pro se.

Thomas E. Logan, Dayton, OH, pro se.

Junelle Gaston, Dayton, OH, pro se.

AJ Gaston, Dayton, OH, pro se.

Robert L. Ryan, Hamilton, OH, pro se.

Janice Rountree, Dayton, OH, pro se.

Martin Prisc, Kennewick, WA, pro se.

Gary F. Hemminger, Waynesville, OH, pro se.

Wayne Mosman, Watertown, CT, pro se.

M. Edward Anderson, Kettering, OH, pro se.

Donald R. Bohl, Lebanon, OH, pro se.

Keith Ohler C., Los Alamos, NM, pro se.

Richard H. Talbert, Fairfield, OH, pro se.

Gary James Leppla, Leppla Associates, Dayton, OH, for Gary Nesslage.

Louise Malbin Roselle, Paul M. De Marco, Waite, Schneider, Bayless & Chesley Co., Cincinnati, OH, for Charles Wood.

DECISION AND ENTRY DENYING FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AGREEMENT; ORDER OF JULY 9, 1999, INTER ALIA, CONDITIONALLY CERTIFYING SUBCLASSES FOR PURPOSES OF SETTLEMENT AND PRELIMINARILY APPROVING PROPOSED SETTLEMENT (DOC. # 31) VACATED; FURTHER PROCEDURES ORDERED OF PLAINTIFFS AND DEFENDANTS; MOTION TO INTERVENE FILED BY CLASS MEMBERS FRANK BREWER, JAMES REED, AND ERIC KIRK (DOC. # 43) OVERRULED, AS MOOT; MOTION TO INTERVENE FILED BY CLASS MEMBER MARK LERMAN (DOC. # 68) OVERRULED, AS MOOT

RICE, Chief Judge.

This matter comes before the Court for review of a proposed class action Multi–Party Settlement Agreement.[1] The proposed Agreement seeks to resolve an August 15, 1995, class action Complaint (Doc. # 1), filed by twelve current and former workers (and their union representatives) at the Mound nuclear weapons facility in Miamisburg, Ohio. Among other things, the Complaint alleges that the Defendants intentionally exposed the Plaintiffs to radioactive isotopes, failed to safeguard against radiation exposure, failed to test for such exposure, and concealed information regarding radiation exposure. The Complaint seeks injunctive relief, as well as compensatory and punitive damages, and it includes claims of negligence, fraud, intentional interference with prospective economic advantage, and negligence per se.

The Plaintiffs filed their Complaint on behalf of current and former employees of the Mound facility who were, or may have been, exposed to any radioactive element or isotope. The Complaint names as Defendants

---

1. The proposed Multi–Party Settlement Agreement will be referred to hereinafter as the "Set-

tlement Agreement" or the "Agreement."

the Monsanto Research Corporation ("Monsanto") and EG & G Mound Applied Technologies, Inc. ("EG & G"). Those entities are the former Department of Energy ("DOE") contractors responsible for operating the Mound facility. Parties to the proposed Settlement Agreement include the Plaintiffs, the Defendants, and the DOE, which is not a Defendant in this litigation.

## I. *Analysis*

██ A class action may not be settled without notice of the proposed settlement to all affected class members and the approval of the Court. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620–621, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), citing Fed. R.Civ.P. 23(e). Before granting final approval of a class action settlement, the Court must follow a three step process. *First,* the Court must preliminarily approve the proposed settlement. *Second,* members of the class must then be given notice of the proposed settlement. *Third,* a hearing must be held, after which the Court must decide whether the proposed settlement is fair, adequate, and reasonable to the class as a whole, and consistent with the public interest. *Bailey v. Great Lakes Canning, Inc.,* 908 F.2d 38, 42 (6th Cir.1990); *United States v. Jones & Laughlin Steel Corp.,* 804 F.2d 348, 351 (6th Cir.1986); *Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983); *Bronson v. Board of Educ. of City School Dist.,* 604 F.Supp. 68, 71 (S.D.Ohio 1984) (Rice, J.).

In accordance with the foregoing requirements, the Court filed an Order granting preliminary approval to the parties' Settlement Agreement on July 9, 1999. (Doc. # 31). The Order also conditionally certified the following sub-classes, pursuant to Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, for settlement purposes only:

Settlement Subclass A Group 1. Employees of Defendant EG & G Mound employed at the Mound site as of November 8, 1995, who are terminated or notified that they are facing termination as a result of the termination of the EG & G Mound contract, of subsequent prime contracts, or

of subsequent privatization actions, subcontracts, or direct DOE procurements during the term of the EG & G Mound contract at Mound or subsequent prime contracts at Mound.

Settlement Subclass A Group 2. Active EG & G Mound employees as of March 1, 1997, including Plaintiffs, salaried employees, OCAW bargaining unit employees and IPGWA bargaining unit employees employed as of March 1, 1997. Except that all managers and supervisors employed on March 1, 1997, by EG & G Mound shall not be included.

Settlement Subclass B. Former employees of Monsanto Research Corporation and/or EG & G Mound regardless of the reason for their separation from employment, and specifically including all retirees of Monsanto Research Corporation and EG & G Mound.

(*Id.* at 2).

In its Order, the Court set forth a procedure for providing notice of the proposed Settlement Agreement to members of the settlement subclasses. (*Id.* at 2). The Defendants complied with the Court's July 9, 1999, Order by supplying first-class mail notice of the proposed Agreement, and a scheduled fairness hearing, to all known members of the settlement classes and publication notice to all other members. In a prior oral ruling, the Court determined that the notice procedures employed "were more than adequate, that they constituted the best form of notice reasonably calculated to reach most members of the class and subclasses."[2] *Cf. Bronson,* 604 F.Supp. at 72, quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Such notice was sufficient to provide class members with " 'a full and fair opportunity to consider the proposed decree and develop a response.' " *Id.,* quoting *Williams v. Vukovich,* 720 F.2d at 921.

After the Defendants provided notice as set forth above, the Court received written objections from approximately fifty affected class members. In addition, the Court has received a petition bearing the caption "Ob-

---

2. *See* Transcript of Sept. 24, 1999, Fairness Hearing, Doc. # 97, at 11.

jections of Hundreds of Proposed Class Members to the Proposed Settlement." (Doc. # 57). The petition, which purports to bear the signatures of several hundred settlement class members, states: "We, the undersigned, object to the proposed Multi–Party Settlement Agreement in the lawsuit of *Katherine E. Levell, et al. vs. Monsanto Research Corp., et al.,* Case Number C–95–312, for the reasons set forth in the objection of Frank Brewer and his fellow objectors."[3] (*Id.*).

After reviewing the foregoing written objections, and written responses to those objections filed by the named class representatives (Doc. # 89)[4] and the Defendants (Doc. # 92), the Court conducted a hearing on September 24, 1999, to allow the parties, counsel, members of the settlement subclasses, representatives of the Department of Energy, and other interested persons to comment upon the proposed Settlement Agreement. Based upon the testimony provided at that hearing, the various written submissions, and its familiarity with this litigation, the Court is now prepared to render its opinion concerning the fairness, reasonableness, and adequacy of the proposed Agreement to the class as a whole. Before doing so, however, the Court will briefly address a threshold issue regarding class certification. After addressing that issue, the Court will engage in a detailed analysis of the proposed Settlement Agreement.

## A. *Conditional Class Certification for Settlement Purposes*

As noted, *supra,* the Court entered a July 9, 1999, Order conditionally certifying subclasses in this litigation for settlement purposes only. (Doc. # 31). The Court entered the Order in response to a Motion filed by the parties. (Doc. # 28). In that Motion, the parties *jointly* moved the Court for conditional certification of this litigation as a class action. (*Id.* at 7). In so doing, they represented to the Court that all requirements of Fed.R.Civ.P. 23(a) and 23(b) were satisfied.

Rule 23(a) establishes four prerequisites to a class action: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed.R.Civ.P. 23. In their joint Motion, the parties insisted that the present litigation "clearly meets the four prerequisites of Rule 23(a)." (Doc. # 28 at 8).

If these threshold requirements are met, an action may be maintained as a class action, provided that one of the requirements of Rule 23(b) is satisfied. A class action is maintainable under Rule 23(b)(1)(A) if separate actions would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class. Rule 23(b)(2) applies when the party opposing the class has acted or has refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole. In their joint Motion, the parties "agreed that the proposed settlement class in this action may be certified under Rule 23(b)(1) or Rule 23(b)(2)...." (Doc. # 28 at 10). After reviewing the parties' Motion, the Court conditionally certified the class under Rule 23(b)(1)(A) and (b)(2).

Notably, however, in their proposed Settlement Agreement, the parties jointly express considerable *doubt* about the propriety of class certification. In particular, they state that "the pleadings, informal discovery and proceedings have revealed the existence of *sharply contested issues* as to whether: (a) any class should be certified...." (*See* Proposed Multi–Party Settlement Agreement at 4) (emphasis added). Likewise, class counsel represent in the proposed Agreement that "the outcome of the case, both as to the

---

3. The "Brewer objections" were filed by class members Frank Brewer, James Reed, Charles Woods, Gregory Fullenkamp, and Eric Krik. (Doc. # 54).

4. The objections of the class representatives appear at Doc. # 89 as an attachment to a Motion to exceed page limits.

propriety of class certification and the results of the claims, is uncertain[.] ..." (*Id.*). As a result, class counsel set forth their belief that "it is desirable and in the best interest of the persons in whose behalf the case was commenced to settle the litigation with Defendants as set forth in the Settlement Agreement...." (*Id.*).

■ To date, the parties have not litigated the class certification issue, primarily because the Defendants have not contested certification. Instead, the parties jointly represented to the Court that the requirements of Rule 23(a) and (b) had been satisfied. In the proposed Settlement Agreement itself, however, the parties inform the Court that informal discovery has produced "sharply contested issues" as to whether class certification is appropriate. As noted above, class counsel even rely upon this uncertainty as an argument for approving the Settlement Agreement and avoiding litigation of what they perceive to be a thorny issue. Both parties fail to recognize, however, that if class certification is not appropriate under Rule 23(a) and (b), then the Court *cannot* approve the proposed Agreement. In *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 621, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the United States Supreme Court unequivocally stated that the requirements of Rule 23(a) and (b) must be satisfied, even "when settlement, rather than trial, is proposed." In reaching this conclusion, the Court recognized that "[t]he safeguards provided by Rule 23(a) and (b) class-qualifying criteria ... are not impractical impediments—checks shorn of utility—in the settlement-class context." *Id.*

Given the parties' joint representation to the Court that informal discovery has resulted in sharply divergent opinions about the propriety of maintaining this litigation as a class action, and class counsel's representation that the viability of the class action is questionable, the Court is uncomfortable granting final approval of the Settlement Agreement. In short, the parties seek the Court's approval of a class action settlement, the very terms of which call into question the viability of the class covered by the agreement. In light of *Amchem,* the Court will not approve the parties' proposed Settlement Agreement, without first resolving their unspecified "contested issues" regarding class certification and assuring itself that this litigation is maintainable as a class action.[5] Given the parties' concerns, it may be that the class certification issue will need to be litigated before the Court reviews any future proposed Settlement Agreement.[6]

### B. Substantive Analysis of Proposed Settlement Agreement

■ ■ Turning now to the substance of the proposed Settlement Agreement, the Court notes, as a threshold matter, that it lacks the authority to modify the terms of that Agreement. Only the parties, during arms' length negotiations, have the power to change the terms of their Agreement. The Court has the power to do only the following:

1. to approve the agreement as negotiated and agreed to by the parties, without changes;

2. to reject the agreement and, in effect, to send the parties back the negotiating table, without suggestions or recommendations by the Court; or

3. To reject the agreement, as negotiated and approved, but with suggestions and recommended changes to the parties.

*Bronson,* 604 F.Supp. at 73; *see also Brown v. County of Genesee,* 872 F.2d 169, 173 (6th Cir.1989) ("It is well established that a 'court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement.' ").

■ With these limited options in mind, the Court turns now to its review of the proposed Settlement Agreement. In determining whether the Agreement is fair, rea-

---

**5.** In its analysis, *infra,* the Court has set forth several *tentative* observations regarding the propriety of certifying this action as a class action. Those observations are based upon the Court's present knowledge of the issue, without respect to the unspecified concerns mentioned in the proposed Settlement Agreement.

**6.** Although the Court has set forth a tentative analysis of the class certification issue, it denies final approval of the proposed Settlement Agreement, *infra,* for reasons unrelated to class certification.

sonable, and adequate to the class as a whole, several factors should be considered, including: (1) the Plaintiffs' likelihood of success on the merits balanced against the amount and form of relief offered in the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the judgment of experienced trial counsel; (5) the nature of the negotiations; (6) the public interest; and (7) objections raised by class members. *Vukovich,* 720 F.2d at 922–924; *People First of Tenn. v. Arlington Developmental Center,* 145 F.3d 1332, 1998 WL 246146 (6th Cir. May 7, 1998) (unpublished), citing *Vukovich,* 720 F.2d at 922–924; *Bronson,* 604 F.Supp. at 73; *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 245 (S.D.Ohio 1991) (Smith, J.). While the foregoing criteria will guide the Court's analysis, "[a] class action settlement cannot be measured precisely against any particular set of factors." *Whitford v. First Nationwide Bank,* 147 F.R.D. 135, 140 (W.D.Ky.1992), citing *Ohio Public Interest Campaign v. Fisher Foods, Inc.,* 546 F.Supp. 1, 6–7 (N.D.Ohio 1982); *Thompson v. Midwest Foundation Indep. Physicians Assoc.,* 124 F.R.D. 154 (S.D.Ohio 1988). Therefore, the relevance of the factors set forth above "will vary from case to case." *Ohio Public Interest Campaign,* 546 F.Supp. at 6–7.

When considering the foregoing factors, the Court "does not resolve the legal and factual issues that are the basis of the underlying lawsuit." *Bronson,* 604 F.Supp. at 74. Additionally, the Court " 'may not withhold approval simply because the benefits accrued from the [agreement] are not what a successful plaintiff would have received in a fully litigated case.' " *Id.,* quoting *Vukovich,* 720 F.2d at 922. Once preliminary approval has been granted, a class action settlement is presumptively reasonable, and an objecting class member must overcome a heavy burden to prove that the settlement is

unreasonable. *Vukovich,* 720 F.2d at 921; *Bronson,* 604 F.Supp. at 71. A settlement "is a compromise which has been reached after the risks, expense, and delay of further litigation have been assessed." *Williams,* 720 F.2d at 922. It its well settled that "[c]lass counsel and the class representatives may compromise their demand for relief in order to obtain substantial assured relief for the plaintiffs' class." *Id.* At the same time, however, the Court also must ensure that "the interests of counsel and the named plaintiffs are not unjustifiably advanced at the expense of unnamed class members.' " *Bailey,* 908 F.2d 38, 42 (6th Cir.1990), quoting *Vukovich,* 720 F.2d at 923. With the these principles in mind, the Court makes the following findings regarding the individual factors set forth above.

1. *Likelihood of Success Balanced Against Amount and Form of Relief Offered by Proposed Settlement Agreement*

The proposed Settlement Agreement provides for class members to release EG & G, Monsanto, Babcock & Wilcox,[7] and the DOE from liability for all claims stemming from exposure to radiation, beryllium, and asbestos.[8] The release encompasses the claims set forth in the Plaintiffs' Complaint, which alleges negligence, fraud, intentional interference with prospective economic advantage, and negligence per se. Although the Court may not resolve the merits of these claims when reviewing the proposed Settlement Agreement,[9] it notes that several significant defenses "obstruct Plaintiffs on their journey to ultimate success in this action." *Bronson,* 604 F.Supp. at 74. Indeed, the Defendants have identified a number of potential defenses to the Plaintiffs' tort claims. (Doc. # 28 at 13–21). *First,* the Defendants contend that the Plaintiffs will be unable to prove radiological exposure exceeding federal dose limits, which is a prerequisite to their recovery under tort law. *Sec-*

---

7. Babcock & Wilcox, a non-party to this litigation, is the current DOE contractor at the Mound facility.

8. Under the Agreement, the class members do not release claims which are not based on exposure to radiation, asbestos, and beryllium. Nor do they release claims based on acts which occur

after the effective date of the release, claims against third-parties (e.g., claims against asbestos manufacturers), or workers' compensation claims.

9. *See Bronson,* 604 F.Supp. at 74.

*ond,* they argue that the individual named Plaintiffs, all or nearly all of whom are union members, are subject to a collective bargaining agreement and, therefore, that their claims are preempted by federal labor law. *Third,* the Defendants argue that the two unions themselves lack associational standing to assert claims on behalf of their members. *Fourth,* the Defendants insist that the Plaintiffs cannot prove an employer intentional tort, and that their negligence claims are barred by Ohio's workers' compensation statute.

Although the Plaintiffs dispute each of the foregoing arguments, the Court nevertheless recognizes that their ultimate success in this litigation is far from assured. The defenses asserted by EG & G and Monsanto are substantial, and the Plaintiffs will face significant risks if they proceed to trial. Against this conclusion, the Court must balance the relief that the proposed Settlement Agreement will afford the class members.

In that regard, the Agreement provides a variety of benefits, including occupational disease insurance, certification of causation for workers' compensation claims related to asbestosis and berylliosis, radiological dose reconstruction, enhanced radiation protection at the Mound facility, expert review of records and workplace safety practices, mandatory contractor compliance with 10 C.F.R. Part 835, hiring preferences for certain former Mound employees, monetary payments from a settlement fund, and the payment of attorneys' fees and various costs by the Defendants and the DOE.

Upon review, however, the Court finds the foregoing relief problematic for two primary reasons. *First,* it disparately benefits current employees, who are represented by nearly all of the named class members, at the expense of former employees and retirees. *Second,* much of the relief is contingent upon the DOE's receipt of federal funding, and the Agreement provides class members with absolutely no recourse if Congress fails to appropriate the requisite funds. In order to illustrate these deficiencies, the Court will conduct a benefit-by-benefit review of the proposed Settlement Agreement.

a) *Occupational Disease Insurance*

The class representatives tout this aspect of the proposed Agreement as "the most important benefit." [10] The Agreement states that the DOE will provide occupational disease insurance to cover the cost of medical care related to specified radiogenic cancers and diseases.[11] The insurance covers uninsured former Mound employees, and current employees who become separated without retiree medical benefits. The insurance is not available to any former employee who receives other health insurance or Medicare coverage.

This component of the Agreement is laudable, insofar as it guarantees that all former and current Mound worker will have primary insurance coverage for radiogenic diseases. However, it provides no benefit whatsoever for those class members who already receive (and will continue to receive) Medicare, retiree medical insurance, or alternative coverage from another employer.[12]

Perhaps more importantly, radiogenic insurance coverage is guaranteed for only

---

**10.** *See* Transcript of September 24, 1999, Fairness Hearing, Doc. # 97, at 33.

**11.** The list of covered occupational diseases includes leukemia (lymphatic and non-lymphatic), female breast cancer, thyroid cancer, bladder cancer, bone cancer, lung cancer (and other respiratory cancers), pancreatic cancer, digestive cancer, multiple myeloma, pharynx cancer, and brain/nervous system cancer.

**12.** The Agreement provides that salaried employees must have completed a probationary period of six months in order to be eligible for the occupational disease insurance, whereas hourly employees must have completed a probationary period of only thirteen weeks. The Settlement Agreement provides no explanation for this distinction. Additionally, the Agreement provides that insurance coverage will cease when a former non-bargaining unit (i.e., non-union) worker obtains health insurance coverage elsewhere. In consideration of the release of the union Plaintiffs' claims, however, "coverage for former bargaining unit employees will be provided until such time as the individual·is covered by a retiree medical benefits program or Medicare," regardless of whether the former bargaining unit employee obtains coverage elsewhere.

three years.[13]  After that time, the Agreement states that "coverage will continue to be provided, subject only to the availability of appropriated funds."  Despite this significant contingency, the Defendants and the class representatives seek to assure the Court that funding for the insurance will be available.[14] In their written Memoranda, they stress that the Agreement refers to "the availability of appropriated funds" only because the federal Anti–Deficiency Act, 31 U.S.C. § 1341, prohibits federal agencies from contracting to spend money that Congress has not appropriated.  (Doc. # 92 at 10–11;  Doc. # 89 at 40).  The Defendants insist that "there is no basis for the speculation that funding will end after three years, and that speculation should not be credited."  (Doc. # 92 at 11).

Although the Court recognizes that the Anti–Deficiency Act prohibits the DOE from contracting to spend non-appropriated money, speculation regarding appropriation of funding for medical insurance is not unfounded.  Indeed, the Settlement Agreement reflects that the Defendants themselves have speculated about the occurrence of such a contingency.  Notably, the Agreement insulates the Defendants from *any* liability if Congress fails to appropriate the necessary funds.  In relevant part, it provides:

> Provision of the funding necessary for compliance with the terms of this Settlement Agreement is solely the responsibility of the United States Department of Energy.  The named plaintiffs, DOE, EG & G Mound Applied Technologies, Inc., and Monsanto Research Corporation agree that *in the event of a failure of the DOE or a delay by the DOE, to provide adequate funds to accomplish any aspect of this Settlement Agreement, named plaintiffs and the members of the class shall not have a claim to enforce this Settlement Agreement against either Monsanto Research Corporation, EG & G Mound Applied Technologies, Inc., or any successor contractor at the Mound site.*  If named plaintiffs or any member of the class should initiate any proceeding to enforce the terms of this Settlement Agreement as a result of the unavailability of funds necessary for compliance with the terms of this Settlement Agreement, Monsanto Research Corporation, EG & G Mound Applied Technologies, Inc., and any successor contractor *may raise as an absolute defense to such action that the DOE was solely responsible for providing the funds necessary for compliance with the terms of this Settlement Agreement* .

(Settlement Agreement, Doc. # 28, Exh. A at 28–29) (emphasis added).

Thus, on one hand, the proponents of the Settlement Agreement insist that it adequately provides for continued insurance coverage after three years, and that any speculation to the contrary is unfounded.  (Doc. # 92 at 10–11).  On the other hand, however, the Defendants have negotiated an Agreement which absolves them from all liability, yet still allows them to enforce the class members' release of claims, if a lack of funding from Congress renders continued insurance coverage unavailable.[15]  The inclusion of

---

**13.**  The Agreement states that the "DOE will provide initial funding not to exceed $200,000 to cover the anticipated costs of coverage for the first three years of the policy....  This agreement is premised upon the availability of insurance from the market at rates not to exceed $200,000 for years one through three."  Thus, the guarantee of insurance for years one through three appears to be contingent upon the DOE obtaining such coverage for $200,000 or less.  While one might instinctively question the adequacy of this amount, no evidence has been presented setting forth the anticipated cost of the insurance coverage provided in the Settlement Agreement.

**14.**  At the September 24, 1999, fairness hearing, a representative of the DOE characterized the agency's settlement obligations as a "high priori-ty."  Quite understandably, however, he could not guarantee that Congress would appropriate enough money to fund the obligations set forth in the Settlement Agreement.  Nor can it be guaranteed that the DOE's settlement obligations will remain a "high priority" when the Agency operates under the control of future presidential administrations.

**15.**  The funding aspect of the proposed Settlement Agreement appears to place the class members in a worse position than if they proceeded to trial and obtained a judgment.  If the class members were to prevail on their claims at trial, they would obtain a judgment against the Defendants (i.e., Monsanto and EG & G).  Thereafter, they presumably could levy against the assets of Monsanto and EG & G to satisfy their judgment.

such a provision in the Agreement demonstrates to the Court that the availability of future funding *is* a serious concern. Although the Anti–Deficiency Act prevents the Defendants from guaranteeing the availability of funds, it does not compel the drafting of a Settlement Agreement which allocates the risk of loss entirely upon the class members if funding is not provided.[16]

b) *Certification of Causal Relationship for Workers' Compensation Purposes*

The Settlement Agreement provides that the DOE will "instruct" its prime contractor "to certify the causal relationship for workers' compensation claims for confirmed cases of berylliosis and asbestosis." This feature of the settlement agreement enures to the benefit of all class members. Current employees, former employees, retirees, union members, and non-union members alike may have occasion to file a claim for workers' compensation benefits. Unfortunately, the true value of this benefit to the class members cannot be determined based upon the present record. The Court has seen no evidence regarding the percentage of Mound cases in which causation is disputed with respect to asbestosis and berylliosis claims. Although the Court cannot say so with certainty, it appears unlikely that an employee who regularly works, or worked, with beryllium or asbestos would have a difficult time establishing a causal connection between his berylliosis or asbestosis and the workplace. In any event, absent evidence on the issue, the Court concludes that this aspect of the Settlement Agreement is of some value to all class members.

c) *Radiological Dose Reconstruction*

The Settlement Agreement provides that the DOE will contract to complete a radiological dose assessment for pre–1989 radiation exposure. The assessment will identify class members who have received a probable dose of radiation exposure greater than 20 Rem, and it will calculate the dose received by such workers. This aspect of the Settlement Agreement applies to all class members, insofar as each member will be screened to determine whether his or her "probable dose" of radiation exposure exceeds 20 Rem.[17] However, the primary beneficiaries of this relief will be those class members who are found to have received a probable dose in excess of 20 Rem. Those class members will receive a dose reconstruction,[18] which the named class representatives have valued at approximately $2,000 per person. (Class Representatives' Preliminary Response to Objections, Doc. # 89 at 30).[19]

Under the terms of the proposed Settlement Agreement, however, the Plaintiffs have no recourse against Monsanto and EG & G for anything. Instead, they must rely upon the DOE, a non-party to this litigation, to seek the appropriation of federal funding to cover the cost of the benefits contained in the Agreement.

16. For example, the Settlement Agreement could minimize concerns about the Anti–Deficiency Act by requiring the Defendants to provide any funding that is not appropriated by Congress. Alternatively, the Agreement could provide that Congress' failure to appropriate funds vitiates the settlement, relieving the Defendants of their obligations under the Agreement and reviving the Plaintiffs' ability to commence litigation. Finally, the Agreement could require the DOE to provide funds now to purchase an insurance policy that provides lifetime insurance for the class members. While the foregoing examples do not constitute an exhaustive list of potential alternatives, they would re-allocate the risk of loss, removing it from only the class members, who are unable to seek the appropriation of the requisite funding or to bear the expense if such funding is not forthcoming.

17. The proposed Agreement does not set forth how such a determination will be made.

18. Although the proposed Settlement Agreement *does not define "dose reconstruction,"* the phrase has been defined elsewhere as " 'the process of estimating doses to the public from past releases to the environment of radionuclides.... Those doses form the basis for estimating health risks and for determining whether epidemiologic studies are warranted.' " *In re TMI Litigation,* 193 F.3d 613, 671 n. 98 (3rd Cir.1999), quoting National Research Council, Radiation Dose Reconstruction for Epidemiologic Uses at 7 (1995).

19. The Court also recognizes that class members with a probable dose of less than 20 Rem will benefit from the radiological dose assessment in a less tangible way. Although those class members will not receive a dose reconstruction, they will receive peace of mind from knowing that their estimated dose of radiation exposure is relatively low.

The pre–1989 does reconstruction constitutes a $2,000 benefit to any class member who receives it, because existing law only requires such dose reconstructions for radiation exposure occurring from 1989 to the present. *See* 10 C.F.R. § 835.702(c)(5)(iii).

### d) *Enhanced Radiation Protection at Mound Facility*

The Settlement Agreement also provides for enhanced workplace radiation protection. Specifically, the DOE agrees that it will: (1) install automated personal contamination monitors and an automated radiological record keeping system; (2) identify and train six dedicated radiological control technicians; (3) assess the need for personal air samplers for workers, and complete enhancements to the continuous air monitoring program; (4) apply its bioassay accreditation criteria to the existing bioassay analysis laboratory program to identify areas for improvement, and establish a DOE validation program; and (5) evaluate existing internal dosimetry dose calculation methodologies to validate proper treatment of particle size and chemical form radioisotopes.

The foregoing safety measures unquestionably benefit those class members who are current Mound employees. The measures have no value, however, to former Mound employees and retirees.

### e) *Expert Review of Records and Workplace Safety Practices*

The Settlement Agreement obligates the DOE to provide up to $250,000 for an independent expert to review records and safety practices at the Mound and to report the results of that review, along with recommendations for improvements. Additionally, the Agreement grants the expert the authority to suspend work if a dangerous condition or act is discovered. Among other things, the Agreement also obligates the DOE to seek

funding to implement those recommendations with which it agrees. The Agreement does not guarantee that funding will be provided.

Much like the enhanced workplace radiation protection discussed, *supra*, this aspect of the Settlement Agreement enures to the benefit of only those class members who are current Mound employees. The measures have no value to former Mound employees and retirees.

### f) *Requirement of Compliance with 10 C.F.R. Part 835*

▆▆▆▆ The Settlement Agreement provides that the DOE will require the Mound contractor to incorporate a provision into its collective bargaining agreement, obligating it to comply with the provisions of 10 C.F.R. Part 835 and making noncompliance subject to grievances by union members.[20] The Court notes, however, that contractors at the Mound facility are already obligated to comply with 10 C.F.R. Part 835. Ordinarily, a defendant's promise to do that which the law already requires is not a valuable benefit. *See Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir.1981), vacated on other grounds and modified, 670 F.2d 71 (6th Cir.1982) (finding little benefit to class members from settlement agreement provisions which obligated the defendant "to do what the law generally requires"); *Reich v. Walter W. King Plumbing & Heating Contractor, Inc.*, 98 F.3d 147, 150 (4th Cir.1996) (concluding that the defendant was not the "prevailing party" under a settlement agreement which merely obligated the plaintiff to do that which the law already required); *In re Ford Motor Co. Bronco II Products Liability Litigation*, 1995 WL 222177 (E.D.La.1995) ("Moreover, Ford is already required by the NHTSA to provide to Bronco II owners the kind of safety information provided pursuant to the proposed settlement.... The proposed settlement therefore merely provides

---

**20.** Part 835 is a multi-faceted regulation which establishes national "radiation protection standards, limits, and program requirements for protecting individuals from ionizing radiation resulting from the conduct of DOE activities." 10 C.F.R. Part 835.1(a). Part 835 imposes various management and administrative requirements, standards for internal and external radiation exposure, and requirements for monitoring of individuals and areas. It also addresses issues such as entry into radiological areas, posting and labeling, record keeping, reporting to individuals, radiation safety training, design and control, radiological contamination control, radioactive contamination control, sealed radioactive source control, and emergency exposure situations.

plaintiffs with information to which they were already entitled and confers no additional value in consideration for the release of plaintiffs' claims."); *Jamison v. Butcher & Sherrerd,* 68 F.R.D. 479 (E.D.Pa.1975) (rejecting a proposed settlement when class members received nothing beyond the amount to which they were already entitled under a separate settlement).

In the present case, however, the Court concludes that this aspect of the Settlement Agreement is of value to bargaining-unit employees. As noted above, it makes compliance with 10 C.F.R. Part 835 part of a collective bargaining agreement, thereby subjecting violations to grievances by union members.

### g) *Hiring Preferences for Certain Mound Employees*

The Settlement Agreement also provides a job preference for members of Settlement Subclass A Group 1.[21] Under the Agreement, the DOE will instruct Babcock and Wilcox (the current prime contractor at the Mound facility) and its successors to institute a "right of first refusal" procedure through 2005. In general terms, that procedure will grant a hiring preference to members of Subclass A Group 1 with respect to future employment opportunities at the Mound facility.

Although the 1993 Defense Authorization Act, 42 U.S.C. § 7274h, already provides a hiring preference for individuals such as those in Subclass A Group 1, the Court notes that the legislation includes no express or implied private right of action to enforce its provisions. *Pawlick v. O'Leary,* 155 F.3d 560, 1998 WL 390540 (4th Cir. June 26, 1998); *Oil, Chemical & Atomic Workers Intern. Union, AFL–CIO v. Pena,* 18 F.Supp.2d 6, 16 (D.D.C.1998). Consequently,

the "right of first refusal" contained in the Settlement Agreement benefits the members of Subclass A Group 1 by providing them with a contractually enforceable hiring preference. It provides no benefit, however, to other class members.

### h) *Payment from Settlement Fund*

The proposed Settlement Agreement states that the Defendants and the DOE "agree to pay a lump-sum payment not to exceed $926,000 to establish a 'Settlement Fund' that shall be distributed to members of Group 2 of settlement subclass A...."[22] Out of the settlement fund, named class representatives are to receive an amount not to exceed $16,500 per person for their time, effort, and expenses as class representatives. The remaining funds are to be distributed equally among all members of Subclass A Group 2.

By its own terms, this aspect of the Settlement Agreement benefits only the class representatives and members of Subclass A Group 2 (i.e., individuals who were active EG & G employees as of September 1, 1997, except for managers and supervisors, who do not share in the fund). The settlement fund is of no value to members of Subclass A Group 1 or Subclass B (which would include former Mound employees and retirees).

### i) *Payment of Attorneys' Fees and Various Costs by DOE and Defendants*

The Settlement Agreement provides that the DOE and the Defendants will pay a lump-sum not to exceed $180,000 for the Plaintiffs' attorneys' fees and costs incurred in this litigation, and a lump-sum not to exceed $32,000 for reimbursement of "reasonable costs and fees incurred by [P]laintiffs in responding to the class notice and other

---

**21.** As noted, *supra,* Settlement Subclass A Group 1 consists of "[e]mployees of Defendant EG & G Mound employed at the Mound site as of November 8, 1995, who are terminated or notified that they are facing termination as a result of the termination of the EG & G Mound contract, of subsequent prime contracts, or of subsequent privatization actions, subcontracts, or direct DOE procurements during the term of the EG & G Mound contract at Mound or subsequent prime contracts at Mound."

**22.** This portion of the Settlement Agreement identifies the class members who will be entitled to a share of the settlement fund as follows: "Group 2 of settlement subclass A consists of the active prime contractor employees as of March 1, 1997[,] including named plaintiffs, salaried employees [with the exception of all managers and supervisors], OCAW bargaining unit employees and UPGWA bargaining unit employees."

costs...." Finally, the Agreement states that the "DOE and Defendants agree to assume the cost and responsibility of providing notice to the class."

In their Memorandum in Response to Objections, the Defendants insist that the foregoing agreement by the DOE and the Defendants to pay attorneys' fees and various administrative costs enures to the benefit of all class members, who would otherwise be required to pay those expenses. (Doc. # 92 at 18). This assertion is true, inasmuch as the Settlement Agreement could have been structured to provide for the payment of fees and costs by the class members out of the $926,000 settlement fund. On the other hand, the fact that the Defendants and the DOE are paying all fees and costs undoubtedly impacted the size of the settlement fund (or other benefits) available to the class members. Directly or indirectly, then, the cost of this litigation adversely impacts the class members' recovery of other benefits. Consequently, the promise by the Defendants and the DOE to pay the attorneys' fees and administrative costs is of limited value to the class members, given that they likely would have received greater benefits under the Settlement Agreement if they were responsible for paying their own fees and costs.

j) *Conclusion Regarding Likelihood of Success Balanced Against Amount and Form of Relief Offered by Proposed Settlement Agreement*

Based upon the brief discussion set forth above, the Court recognizes that the viability of the Plaintiffs' claims is questionable, even assuming the propriety of class certification. The Defendants have identified a number of obstacles to their ultimate success, including the formidable task of proving an employer intentional tort. On the other hand, the value of the benefits to class members in exchange for the release of their claims is questionable, particularly with respect to those former Mound employees and retirees who already have health insurance coverage, who receive retiree medical benefits, or who are eligible for Medicare. Such employees obtain little under the terms of the proposed Settlement Agreement. Thus, insofar as the Agreement concerns class members who are former employees and retirees, the Court finds that this factor weighs against final approval of the Agreement. While current employees certainly fare better, the Court is nevertheless concerned about the contingent nature of the federal funding for some of the benefits contained in the Settlement Agreement, most notably, the radiogenic disease insurance. With respect to current employees, the Court concludes, on balance, that this factor also militates against final approval of the settlement agreement.

2. *Complexity, Expense, and Likely Duration of Litigation*

The second factor that the Court should consider is the complexity, expense, and likely duration of litigation. This factor unquestionably favors approval of the proposed Settlement Agreement. Assuming that class certification is appropriate and that the Plaintiffs' claims could survive dispositive motions, proceeding to trial would require expensive and time-consuming discovery, it would certainly require the use of expert witnesses, and it might prolong this litigation far into the future. In short, the Court has no doubt that "the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court." *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283, 318 (3rd Cir.1998). "The prospect of such a massive undertaking clearly counsels in favor of settlement." *Id.*

3. *Stage of Proceedings and Amount of Discovery Completed*

When reviewing the proposed Settlement, the Court also should consider the stage of the current litigation and the amount of discovery that the parties have completed. In the present case, the record contains little evidence of formal discovery having taken place. Based upon its familiarity with this litigation, however, and its limited direct involvement in the same, the Court is aware that class counsel retained experts and engaged in substantial informal discovery prior

to the negotiation of the proposed Settlement Agreement.[23]

■■ Counsel's reliance upon informal discovery does not preclude approval of the proposed Settlement. *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d 283, 319 (3rd Cir.1998); *see also In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 211 (5th Cir.1981) (finding settlement appropriate, despite absence of formal discovery, when "plaintiffs did have access to information"); *Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir.1977) ("It is true that very little formal discovery was conducted and that there is no voluminous record in the case. However, the lack of such does not compel the conclusion that insufficient discovery was conducted.").

In the present case, the proposed Settlement Agreement is the product of a lengthy negotiation process which began in 1995 and involved the Plaintiffs, the Defendants, various experts, representatives of the DOE, and, at times, the Court. Substantial informal discovery occurred prior to and during those negotiations. As a result, this factor favors approval of the proposed Agreement.

### 4. *Judgment of Experienced Trial Counsel*

■■ The next factor for consideration is the professional judgment of the experienced trial counsel participating in this litigation. When considering a proposed settlement, the Court "should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs." *Williams,* 720 F.2d at 922–923. "[H]owever, the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered." *Id.* at 923.

As set forth above, the proposal before the Court was reached after informal discovery and extensive negotiations involving competent and experienced counsel for the parties, as well as experts and representatives of the DOE. Therefore, the informed judgment of counsel is entitled to some deference.

**23.** In a December 18, 1995, Order (Doc. # 8), the Court recognized that the parties were engaging

### 5. *Nature of Negotiations*

The Court next must consider the nature of the parties' settlement negotiations. With respect to this factor, the Court finds that settlement negotiations have taken place at arms' length and without collusion. In that regard, this factor militates in favor of approving the proposed Settlement Agreement. The Court's concerns with respect to the proposed Agreement do not involve the integrity of the negotiation process. Rather, the Court has found the *product* of the negotiation process (i.e., the proposed Settlement Agreement itself) problematic for two primary reasons. *First,* as the Court has explained, *supra,* the future availability of some of the benefits offered by the Defendants (most notably, the medical insurance coverage) is contingent upon federal funding (a contingency over which the Defendants have no control and the DOE itself has little, if any, real control). Significantly, the Agreement also provides that inadequate funding by Congress will serve as a complete defense to any action by the class members to enforce its terms. At the same time, the Defendants retain their ability to enforce the Settlement Agreement against the class members. *Second,* as set forth more fully herein, the Court is concerned that the relief provided by the Agreement disfavors former employees and retirees—particularly those who have health insurance coverage. Under the Agreement, such individuals receive only (1) the possibility of a $2,000 dose reconstruction, and (2) the assurance that causation will be certified for workers' compensation purposes, if they ever contract asbestosis or berylliosis.

### 6. *Public Interest*

The next factor for the Court's consideration is the public interest. With regard to this factor, the Court recognizes that the public interest generally favors the resolution of litigation through compromise. The Sixth Circuit has noted that "[s]ettlement agreements should . . . be upheld whenever equita-

in the informal exchange of information.

ble and policy considerations so permit. By such agreements are the burdens of trial spared to the parties, to other litigants waiting their turn before overburdened courts, and to citizens whose taxes support the latter. An amicable compromise provides the more speedy and reasonable remedy for the dispute." *Stotts v. Memphis Fire Dept.,* 679 F.2d 541, 555 n. 11 (6th Cir.1982), rev'd on other grounds, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *see also Franks v. Kroger Co.,* 649 F.2d 1216, 1224 (6th Cir. 1981), vacated on other grounds and modified, 670 F.2d 71 (6th Cir.1982) (recognizing that "the law generally favors and encourages the settlement of class actions"). Nevertheless, where a proposed class action settlement is contrary to the interests of class members, it should not be approved by the Court. *Franks,* 649 F.2d at 1224–1225.

In the present case, the Court concludes that the proposed Settlement Agreement *is* contrary to the interests of the class members in two primary respects. *First,* a substantial portion of the relief provided by the Agreement, including what the class representatives claim is "the most important benefit," is made contingent upon the DOE obtaining federal funding from Congress, and the Plaintiffs have no recourse if funds are not appropriated. *Second,* the Agreement favors current Mound employees over former employees and retirees. Present employees at the facility will receive: (1) guaranteed radiogenic disease insurance, conditioned upon continued funding by Congress, if they become separated from their jobs without retiree medical benefits or Medicare; (2) a $2,000 radiation dose reconstruction, if their exposure is estimated to exceed 20 Rem; (3) a promise that EG & G and successor contractors will maintain retirement benefits at approximately the level currently provided; (4) a promise by the DOE to require compliance with 10 C.F.R. § 835; (5) certification

of causation for workers' compensation purposes, if they contract asbestosis or berylliosis; (6) monitoring of the Mound facility by an independent expert; (7) significantly enhanced workplace radiation protection; and (8) a share of the $926,000 settlement fund (if they were employed on September 1, 1997, and are not managers or supervisors).

By comparison, former workers will receive: (1) guaranteed radiogenic disease insurance conditioned upon continued funding by Congress, if they have no other coverage; (2) a $2,000 radiation dose reconstruction, if their exposure is estimated to exceed 20 Rem; and (3) certification of causation for workers' compensation purposes, if they contract asbestosis or berylliosis. Similarly, the only benefits provided to Mound retirees who already receive retiree medical benefits and retirees who receive Medicare are: (1) the possibility of a $2,000 dose reconstruction; and (2) certification of causation for workers' compensation purposes, if they contract asbestosis or berylliosis.[24] Notably, former workers and retirees are excluded from the settlement fund, and they receive no benefit from the workplace radiation enhancement measures or increased safety monitoring. In addition, if they already receive Medicare, retiree medical benefits, or other medical insurance, they do not benefit at all from the radiogenic disease coverage.[25] Largely for these reasons, the Court cannot find that the proposed Settlement Agreement is in the best interests of all class members. Consequently, the "public interest" factor militates against the Court granting final approval of the Agreement.

### 7. Objections Raised by Class Members

When assessing the fairness and reasonableness of the proposed Settlement Agreement, the Court must consider all objections that have been raised. *Bronson,* 604 F.Supp. at 78; *see also Williams,* 720 F.2d at

---

**24.** With respect to EG & G retirees (as opposed to Monsanto retirees), the Settlement Agreement provides that retiree health care benefits will be maintained at substantially the same level currently provided. This promise is conditioned upon the appropriation of federal funding to continue the EG & G retiree health care benefits at the current level.

**25.** The Defendants have represented that the settlement class consists of approximately 5,000 members. (Doc. # 92 at 1). The Court has no information regarding what percentage of those individuals receive retiree health insurance, Medicare, or another form of insurance coverage.

923. In the present case, the Court has received a number of written objections from class members who are not named representatives.[26] In its analysis, *supra*, the Court has addressed at least two of those objections: (1) the contingent nature of federal funding for several of the benefits contained in the Settlement Agreement; and (2) the disparate benefits received by current employees, former employees, and retirees. Although these concerns are sufficient to justify denying final approval of the proposed Settlement Agreement, the Court will briefly address the other objections which have been raised.[27]

a) *Inability to "Opt–Out" of the Proposed Settlement*

A large number of individuals have objected to their inability to "opt-out" of the proposed Settlement Agreement. As the Defendants properly note, the Court conditionally certified this action, for settlement purposes only, pursuant to Rules 23(b)(1) and (2) of the Federal Rules of Civil Procedure. (Doc. # 31). Unlike Rule 23(b)(3), those provisions do not permit class members to opt-out of a settlement. The only question, then, is whether certification is proper under Rules 23(b)(1) and (b)(2).

■ A class action is maintainable under Rule 23(b)(1)(A) if separate actions would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class. Rule 23(b)(1)(A) is not intended to encompass situations in which many plaintiffs sue the same defendant with the attendant risk that some plaintiffs may recover and others may not. *In re Bendectin Products Liability Litigation*, 749 F.2d 300, 305 (6th Cir.1984); *McDonnell Douglas Corp. v. United States District Court for the Central Dist. of Calif.*, 523 F.2d 1083 (9th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). "Separate litigation must create the risk of producing incompatible, not merely inconsistent, results." *In re Fernald Litigation*, 1986 WL

---

**26.** Among the objections received by the Court is a petition which states, "Objections of Hundreds of Proposed Class Members to Proposed Class Settlement." (Doc. # 57). The petition, which has been signed by what appears to be several hundred individuals, reads: "We, the undersigned, object to the proposed Multi-Party Settlement Agreement in the lawsuit of *Katherine E. Levell, et al. v. Monsanto Research Corporation, et al.*, Case Number C–95–312, for the reasons set forth in the objection of Frank Brewer and his fellow Objectors." (*Id.*). In their Response to the various objections, the class representatives contend that the Court should strike this petition, because it lacks a statement of objections and reasons for those objections. The class representatives also argue that the petition fails to establish that the signers ever saw the "Brewer objections," or that they were fully aware of the issues raised in those objections. Finally, the class representatives contend that the petition "fails to identify which of the issues in the Brewer objections they support." (Doc. # 89 at 34).

After reviewing the petition, the Court declines the class representatives' invitation (no actual motion to strike has been filed) to strike the petition. Although the petition does not include its own statement of objections with supporting reasoning, it adequately incorporates by reference, or adopts, the objections and reasoning set forth in the so-called Brewer objections. Furthermore, the Court cannot agree that the signers have failed "to identify which of the issues in the Brewer objections they support." It appears from the language of the petition that the signers support *all* of the objections voiced by the Brewer objectors. Finally, based upon the signers' declaration that they object for the "reasons set forth in the objection of Frank Brewer and his fellow Objectors," the Court reasonably may infer that each signer saw, understood, and approved of those objections. Consequently, the Court declines to strike the petition from the record.

The Court will give the petition less weight that it otherwise might, however, because it appears from the record that *some* of the signers actually *did not* see the Brewer objections before signing, or were misinformed about nature of the proposed Agreement. In their Memorandum, the class representatives cite evidence indicating that some petitioners signed the petition after being told that approval of the Settlement Agreement would result in reduced retiree benefits. (Schraub Declaration, Doc. # 89, Exh. L, at ¶ 10). Likewise, it appears that *some* of the petitioners may not have seen the Brewer objections prior to signing, and at least one petitioner now wants his name removed. (*Id.* at ¶ 3–5). Furthermore, counsel for the class representatives has represented to the Court that he observed a petition being circulated without the signers being given access to the Brewer objections. (Doc. # 89 at 34).

**27.** For purposes of its analysis, the Court has grouped similar objections.

81380 (S.D.Ohio Sept. 18, 1986) (Spiegel, J.). This type of class action involves "cases where the party is obligated by law to treat all members of the class alike (a utility acting towards customers; a government imposing a tax) or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against down river owners)." *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Rule 23(b)(1)(A) has been found to apply when "inconsistent adjudications of defendants' liability could result potentially in incompatible standards regarding the type and extent of any ordered corrective or preventive relief." *In re Fernald Litigation*, 1986 WL 81380 (S.D.Ohio Sept. 18, 1986) (Spiegel, J.), citing *In re Jackson Lockdown/MCO Cases*, 107 F.R.D. 703 (E.D.Mich. 1985).

In the present case, the Court notes that certification appears to be appropriate under Rule 23(b)(1)(A), at least with respect to class members who are currently employed at the Mound facility. The proposed Settlement Agreement provides for significantly enhanced radiation protection and monitoring from which all employees will benefit, regardless of whether they participate in the present litigation. In addition, allowing the employees to pursue individual actions for such workplace safety enhancements likely would result in incompatible standards regarding the type and extent of corrective or preventive relief ordered by the courts. Specifically, the Defendants could be required to develop individual radiation protection programs tailored to the outcome of numerous separate lawsuits.

Although the foregoing rationale does not apply to former employees and retirees, who derive no benefit from such workplace improvements, it appears that certification may be appropriate as to these class members (as well as the current employees) under Rule 23(b)(2), which applies when the relief sought is exclusively or predominantly injunctive or declaratory. Herein, the relief available to the former employees and retirees includes: (1) a promise of future radiogenic disease insurance, if they lack other coverage; (2) a dose reconstruction, if estimated exposure levels are met; and (3) a promise to certify causation for workers' compensation purposes in cases of asbestosis and berylliosis. Although the Court has found these benefits disparately small when compared to the relief obtained by the current employees, such benefits are at least arguably predominantly injunctive in nature.[28] Likewise, the relief provided to the current employees appears to be predominantly injunctive. Although current employees will receive a share of the settlement fund, the value of that fund is relatively small when compared to the value of the workplace enhancements and other injunctive relief extended to current employees. For example, the DOE estimates that the radiation protection and dose reconstruction work alone will cost more than $8,000,000. (Simak affidavit, attached to Doc. # 92). Consequently, certification appears to be appropriate under Rule 23(b)(2) with respect to all class members. If so, the objectors have no right to opt-out of the proposed Settlement.

### b) *Lack of Commonality of Benefits for all Class Members*

Several objectors assert that the class representatives and counsel have not adequately

---

**28.** In opposition to this conclusion, the Brewer objectors suggest, with little argument and no citation to authority, that the DOE's promise to provide health insurance coverage far into the future should be characterized as monetary damages rather than injunctive relief. (Doc. # 54 at 16). Although this argument has some appeal, the Court need not resolve the issue at the present time. This issue has not been briefed beyond the Brewer objectors' two-sentence argument, and, for the reasons set forth above, the Court concludes that the proposed Settlement Agreement is not fair, adequate, and reasonable to all class members, regardless of whether the insurance coverage is characterized as monetary or injunctive relief. The proper characterization of the health insurance (i.e., either as injunctive relief or monetary damages) is an issue that the parties may wish to address if they choose to litigate their sharp differences regarding the propriety of class certification. At this point, the Court merely observes that class counsel may not actually believe certification is appropriate under Rule 23(b)(1) or (b)(2). Indeed, the parties have represented to the Court that "[i]f Plaintiffs had proceeded absent settlement, they would have moved for certification under Fed.R.Civ.P. 23(b)(3)[,]" which *does* allow class members to opt-out. (*See* Doc. # 28 at 11 n. 5).

represented the class, because the Settlement Agreement does not benefit all class members equally. For example, the Brewer objectors note that the Settlement Agreement favors current employees, who receive the most benefits, at the expense of former workers and retirees, who obtain nothing from the nearly $1,000,000 settlement fund or the multi-million-dollar workplace enhancements and monitoring programs. (Doc. # 54 at 11–14). The Court has addressed this argument at length, *supra*, and need not repeat that analysis here.[29]

The Brewer objectors also note the Settlement Agreement's failure to provide any benefits for the families of deceased Mound workers, despite their contention that such families might be able to assert a claim on behalf of the deceased workers. (*Id.* at 11).

In response, the proponents of the Agreement have represented to the Court that it does not cover deceased workers.[30] Given the Court's rejection of the Settlement Agreement on other grounds, the Court need not resolve this dispute at the present time. The Court notes only that it finds nothing in the Settlement Agreement which excludes deceased former workers from its reach.[31]

### c) *Objections to the Release*

The Court has received objections regarding the scope of the release contained in the Settlement Agreement. Upon review, however, the Court concludes that the release is not overly broad. It is limited to radiation, beryllium, and asbestos-related claims arising from the operation of the Mound facility.[32] As noted, *supra*, the release encom-

29. The Brewer objectors also point out several other instances of disparate treatment in the proposed Settlement Agreement. For example, the Agreement provides that class members who were Mound employees as of March 1, 1997, are entitled to receive a share of the settlement fund, but it excludes managers and supervisors, even if they were employees on that date. In addition, hourly employees qualify for radiogenic disease insurance coverage once they have been employed for thirteen weeks, but salaried employees must be employed for six months before qualifying for the coverage. The Agreement also states that non-bargaining unit employees will receive the insurance coverage only until they obtain other coverage (except to the extent that they have a pre-existing condition), whereas bargaining unit employees will retain the insurance until they receive retiree insurance coverage or Medicare. Furthermore, only workers with asbestosis and berylliosis will receive certification of causation for workers' compensation purposes, even though employees with radiation exposure might contract work-related illnesses.

Although the Court does not believe that class members must receive identical benefits under a settlement agreement, the Court is unaware of the reasons for the foregoing distinctions. It may be that such differential treatment is justified. The Court simply does not recall hearing any explanation for these distinctions. The parties may wish to address these concerns if they elect to negotiate a new settlement.

30. *See, e.g.,* Transcript of Sept. 24, 1999, Fairness Hearing, at 143.

31. As set forth above, Settlement Subclass B includes: "Former employees of Monsanto Research Corporation and/or EG & G Mound regardless of the reason for their separation from employment, and specifically including all retir-

ees of Monsanto Research Corporation and EG & G Mound." On its face, this language appears to include deceased former workers. Therefore, to the extent that family members might be able to assert claims on behalf of deceased workers, such claims do appear to be barred by the Settlement Agreement.

32. Specifically, the release provides that:

1. All members of the settlement subclasses, for himself or herself, and for each of their respective attorneys, heirs, executors, administrators, representatives, agents, successors, assigns and any and all other parties claiming through or by virtue of any member of the settlement class, shall release, waive, withdraw, retract, and forever discharge and acquit B & W, EG & G Mound and [Monsanto Research Corporation] and their parents, subsidiaries, predecessors, successors, officers, employees, agents, and assigns and the United States of America Department of Energy, its predecessors, successors, officers, employees, representatives, agents, and assigns from any and all claims or causes of action, in law or in equity, of any kind whatsoever that they may have, involving personal injury, economic injury, and/or emotional injury stemming from exposure to radiation, beryllium, and asbestos (except workers['] compensation claims), which the members of the settlement subclasses may possess under the Price Anderson Act, the Common Law, or any other federal or state law, regulation, or rule of any kind and which relate in any way:

(a) To [Monsanto Research Corporation's] acts, omissions, disclosures, non-disclosures, or conduct concerning its operation of the Mound facility, including but not limited to all allegations set forth or which could have been set forth in the action;

passes intentional tort claims, but it does not affect the ability of class members to assert workers' compensation claims. Furthermore, it expressly preserves their right to pursue claims: (1) not based upon exposure to radiation, beryllium, and asbestos; (2) based upon activity occurring after final approval of the Settlement Agreement; and (3) based upon discrimination.

### d) Objections Regarding Funding

Several class members object to the contingent nature of the funding for radiogenic disease insurance and other benefits. As set forth more fully above, the Court is equally concerned about the continued availability of funds to provide the benefits set forth in the Settlement Agreement. Many of those benefits are contingent upon Congress' appropriation of money to the DOE, which can only promise to make a good faith effort to obtain the requisite funds. The contingent nature of the federal funding needed to implement key components of the Settlement Agreement militates against final approval.

### e) Objections Regarding Notice

A number of class members object to the adequacy of the notice they received about the proposed Settlement Agreement. These objections are unpersuasive. As set forth, *supra*, the Court has determined that the notice procedures employed "were more than adequate, that they constituted the best form of notice reasonably calculated to reach most members of the class and subclasses."[33]

> (b) To EG & G's acts, omissions, disclosures, non-disclosures, or conduct concerning its operation of the Mound facility, including, but not limited to the specific allegations plead or which could have been plead in the action; and
> (c) To DOE's acts, omissions, disclosures, non-disclosures, or conduct concerning its supervision of B & W, MRC, and EG & G Mound and its oversight of the Mound facility including the specific allegations made or which could have been made in the action; and
> (d) To B & W's acts, omissions, disclosures, non-disclosures, or conduct concerning its operation of the Mound facility, including, but not limited to all allegations set forth or which could have been set forth in the action.

### f) Objections Regarding Cancers Covered by Insurance

The Court has received an objection based upon the exclusion of prostate cancer from the list of cancers covered by the radiogenic disease insurance. The Court notes, however, that the types of cancers covered are those which medical research has linked to radiation exposure. (Rosenman declaration, attached to Doc. # 89 at Exh. B). Furthermore, the Settlement Agreement provides that the list of covered cancers "is subject to additions or deletions by mutual agreement of the parties and the DOE based on whether or not diseases are determined in the future to be radiogenic." The Court finds nothing objectionable about the covered cancers or the possibility that changes may occur in light of new medical research.

### g) Objection to Inclusion of Babcock & Wilcox in Release

One class member has objected to the inclusion of Babcock and Wilcox, the current DOE contractor at the Mound facility, in the release. The Court finds no merit in this objection. The class representatives have informed the Court that the settlement fund was doubled in exchange for the release of Babcock & Wilcox. Furthermore, the Court notes that the company is released from liability only for conduct which occurs prior to the effective date of the Settlement Agreement.

### h) Objections to Independence of Expert

Several class members have questioned the independence of Scott Davidson, the ex-

> The release then expressly excludes workers' compensation claims from its reach. In addition, it expressly excludes claims: (1) not based on exposure to radiation, beryllium, and asbestos; (2) based on activity occurring after its effective date; and (3) claims of discrimination. The release also includes a promise that the class members will not initiate any legal proceedings against the released entities or the government, except to enforce the terms of the Settlement Agreement. Finally, the release provides that the class members may not assert a legal claim "based on the allocations or distributions made substantially in accordance" with the Settlement Agreement and any orders of the Court.

**33.** *See* Transcript of Sept. 24, 1999, Fairness Hearing, Doc. # 97, at 11.

pert appointed to monitor the Mound facility and to report his findings. The Court finds these objections unpersuasive. Davidson was jointly selected by the parties, and the Court discerns no basis for questioning his qualifications, performance, or independence.

### i) *Objections Regarding Job Preferences*

The Court has received objections regarding the "job preference" benefit contained in the Settlement Agreement. These objections suggest that such a preference already exists under federal law. As noted above, however, the existing legislation includes no express or implied private right of action to enforce its provisions. Consequently, the "right of first refusal" contained in the Settlement Agreement benefits the members of Subclass A Group 1, by providing them with a contractually enforceable hiring preference.

### j) *Objections Regarding the Class Members' Receipt of any Benefits*

Two class members argue that the Plaintiffs' claims are meritless and that no benefits should be provided by the DOE or the Defendants. Although those two individuals may believe they were not exposed to radiation at the Mound, the class representatives do allege such exposure. The Court cannot fault the Defendants or the DOE for seeking to settle the Plaintiffs' claims, despite the fact that some workers doubt the validity of those claims.

### k) *Objections that the Settlement Fund is Inadequate*

Several class members argue that the $926,000 settlement fund should be larger. In light of the substantial other benefits provided to those class members *who are eligible to receive a share of the settlement fund,* assuming those benefits can be funded, the Court finds these objections unpersuasive. The fund is to be distributed among the class representatives and those class members who were employed at the Mound facility as of September 1, 1997 (excluding supervisors and managers). Most of those individuals remain employed at the Mound facility. Therefore, they will benefit from, inter alia, the multi-million dollar workplace radiation

protection and monitoring measures that the Settlement Agreement requires. Although certain members of Settlement Subclass A Group 2 (the only class members to share in the settlement fund) may desire a larger cash award, the Court cannot say that the $926,000 fund is unreasonably small. *Cf. Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54, 72 (D.Mass.1997) ("Some class members would prefer larger cash payments or other forms of alternative relief, but this does not itself warrant disapproval of the settlement. The issue is whether the relief that the settlement does provide is adequate and reasonable."); *Curtiss–Wright Corp. v. Helfand,* 687 F.2d 171, 175 (7th Cir.1982) (recognizing that when "a district judge approves a class action settlement ... he almost always overrides the wishes of some class members for a bigger share of the pie").

### l) *Objections Regarding Payment to Class Representatives*

Several class members object to a provision of the Settlement Agreement which awards each class representative $16,500 out of the $926,000 settlement fund. The class representatives have informed the Court that this payment is an incentive fee which compensates them (1) for participating in this litigation, despite the risk of retaliation by DOE contractors, and (2) for the time and effort that they spent in "countless meetings and conference calls and collecting information." (Doc. # 89 at 44).

Given the Court's rejection of the proposed Settlement Agreement, it is premature to discuss the objections to the amount of the class representative incentive payments. If the parties reach a new settlement agreement, that proposal may well contain a different request for compensation, based upon the circumstances existing at that time. For present purposes, the Court merely recognizes that class representatives frequently receive substantial incentive payments to compensate them for their participation in a class action lawsuit. *See, e.g., In re Southern Ohio Correctional Facility,* 175 F.R.D. 270, 272 (S.D.Ohio 1997) (Spiegel, J.) (recognizing that "[c]ourts routinely approve incentive

awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation"); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250–251 (S.D.Ohio 1991) (Smith, J.) (approving $50,000 incentive award to each class representative); *In re Dun & Bradstreet Credit Serv. Customer Litigation*, 130 F.R.D. 366, 373–374 (S.D.Ohio 1990) (Weber, J.) (approving incentive awards of $35,000 to $55,000 for class representatives).

### m) *Objections Regarding Discovery Conducted by Counsel*

Several individuals have objected to the amount of discovery conducted by class counsel prior to negotiating the proposed Settlement Agreement. In its analysis, *supra*, however, the Court addressed this issue and concluded that class counsel possessed sufficient information to assess the relative strengths and weaknesses of the Plaintiffs' claims. Consequently, the Court finds the objections based upon a lack of discovery to be unpersuasive.

### n) *Objections to Certification of Causation for Workers' Compensation Claims*

The Court has received objections regarding the DOE's agreement to require Mound contractors to certify causation, for workers' compensation purposes, for claims involving asbestosis or berylliosis. These objectors appear to fear that their workers' compensation claims might not be approved by the State of Ohio, despite certification of causation. While certification may not guarantee approval of a workers' compensation claim, it certainly improves the chances of a given claim being ultimately approved. Consequently, the Court has recognized that it is a benefit to any class member who files such a claim.

### o) *Objections to Dose Reconstruction and Radiation Protection*

A number of class members have objected to the radiation protection and dose reconstruction provisions of the proposed Settlement Agreement. The essence of these objections is that: (1) such benefits have been promised in the past but not provided: (2) certain protective measures already have been implemented during the pendency of this lawsuit; and (3) accurate dose reconstruction is not possible with respect to certain radioactive materials.

Upon review, the Court finds that these objections do not preclude approval of the proposed Agreement. The fact that certain benefits or protections may have been promised in the past, but not provided, militates in favor of making those promises part of a formal, Court-approved Settlement Agreement, which the Court can, if necessary, enforce through judicial order. In addition, the Court cannot fault the Defendants or the DOE for implementing certain radiation protection measures prior to the final approval of the Agreement. Benefits received during (and due to) the pendency of a class action may be considered by the Court when assessing the adequacy of a settlement agreement. *Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 307 (E.D.Mich.1988). Finally, the fact that a dose reconstruction may be inaccurate with respect to certain radioactive materials does not justify rejection of the proposed Settlement. Limitations on the accuracy of a dose reconstruction may make that benefit less valuable to class members. A dose reconstruction nevertheless remains valuable with respect to those radioactive materials for which exposure levels can be estimated.

### p) *Objections Regarding Structural and Operational Changes*

Several objectors contend that certain features of the proposed Settlement Agreement have no value, because they require no more than what the law already requires. The Court finds these objections unpersuasive, based upon the analysis set forth more fully, *supra*. While the law already requires a contractor's compliance with 10 C.F.R. § 835, the Settlement Agreement benefits union members by allowing them to grieve instances of non-compliance. Similarly, while federal law already requires job preferences, it does not include any private right of enforcement. As noted above, the Settlement Agreement makes those job preferences a contractually enforceable right. Finally, ex-

isting law only requires does reconstructions from 1989 forward, whereas the Settlement Agreement benefits class members by providing for pre–1989 dose reconstructions.

### q) *Objections Regarding Absence of Default Protection*

Finally, several class members object to the Settlement Agreement's failure to protect them in the event of "default" by the Defendants. The essence of this objection is that the proposed Agreement requires class members to relinquish their rights, while insulating the Defendants from liability if the DOE fails to fulfill the promises set forth therein. As set forth more fully, *supra*, this objection possesses merit. The proposed Settlement Agreement provides that the DOE (a non-party to this litigation) will fund most of the benefits contained therein, subject to the appropriation of money by Congress. In exchange, the Agreement requires the class members to release the Defendants and the DOE from liability, but it provides them with no recourse against the Defendants or the DOE if a lack of funding from Congress renders the various benefits (most notably, continued insurance coverage) unavailable.[34] As set forth more fully above, such an arrangement is a legitimate cause for concern.

### IV. *Conclusion*

After reviewing the proposed Settlement Agreement and considering all relevant factors, the Court cannot conclude that it represents a "fair, adequate, and reasonable" resolution for all class members' claims. Accordingly, based upon the reasoning and citation to authority set forth herein, the

Court declines to enter final approval of the Agreement.

For the reasons set forth more fully, *supra*, at footnote two, the Court also declines to enter final approval of the proposed Settlement Agreement due to the parties' serious concern, and disagreement, about the propriety of maintaining this action as a class action. To date, that issue has not been litigated, primarily because the parties jointly represented that it was not a disputed issue. It is apparent, however, that the issue *is* disputed. In any event, the Court has an independent obligation to assure itself that class certification is appropriate, regardless of whether this action is litigated or settled, and the certification issue must be resolved to the Court's satisfaction, prior to the final approval of any settlement.

Accordingly, the Court's July 9, 1999, Order conditionally certifying subclasses for purposes of settlement and preliminarily approving the proposed Settlement Agreement (Doc. # 31) is hereby vacated. In light of the parties' expressed disagreement about the class certification issue, counsel for the Plaintiffs and the Defendants are hereby granted thirty days to file Memoranda setting forth their divergent opinions regarding the propriety of maintaining this litigation as a class action, and ten days thereafter to file Reply Memoranda. The Memoranda should address each of the requirements set forth in Rule 23(a) and (b) of the Federal Rules of Civil Procedure. After reviewing those Memoranda, the Court will file an Entry setting forth its observations on the issue.[35] If the Court is satisfied that this litigation may proceed as a class action under Rule 23, the parties then will be granted sixty days to file a renewed joint Motion for conditional

---

**34.** In opposition to this objection, the Defendants contend that the dissatisfied class members have failed to identify what kind of "default protection" should exist. (Doc. # 92 at 13). The Court finds this argument unpersuasive. As the Court has explained, the objectors assert that they should have some recourse against the Defendants if, for any reason, the DOE fails to provide the benefits set forth in the Settlement Agreement.

**35.** In its analysis, *supra*, the Court has set forth certain observations regarding the propriety of

maintaining this litigation as a class action. Those observations are tentative, and they are based upon the Court's present knowledge of this litigation. As noted above, however, the parties have informed the Court that "informal discovery and proceedings have revealed the existence of sharply contested issues" about the propriety of class certification. Consequently, the Court will reach a more informed decision on the class certification issue after allowing the parties to articulate these unspecified concerns in writing.

class certification and for preliminary approval of a *new* Settlement Agreement. Any new proposed Settlement Agreement must be *newly negotiated,* and it may not consist of a mere refiling of the existing proposal.

Finally, the pending Motions to Intervene filed by class members Frank Brewer, James Reed, and Eric Kirk (Doc. # 43), and by class member Mark Lerman (Doc. # 68), are hereby overruled, as moot. In their respective Motions, these class members seek leave to intervene in this action, as a result of the proposed Settlement Agreement, to protect their interests and to preserve their ability to appeal a judgment from this Court granting final approval of the Agreement. (Doc. # 43 at 1; Doc. # 68 at 1). Given that the Court has declined to grant final approval of the proposed Agreement, and has withdrawn conditional class certification and preliminary approval of that Agreement, these Motions are now moot. Consequently, they are overruled on that basis, without prejudice to renewal in the event that the parties file, and the Court preliminarily approves, a newly negotiated proposed Settlement Agreement.